# United States Court of Appeals
## For the First Circuit

No. 18-1993

UNITED STATES OF AMERICA,

Appellee,

v.

HERZZON SANDOVAL, a/k/a Casper,

Defendant, Appellant.

No. 18-2165

UNITED STATES OF AMERICA,

Appellee,

v.

EDWIN GUZMAN, a/k/a Playa,

Defendant, Appellant.

No. 18-2177

UNITED STATES OF AMERICA,

Appellee,

v.

ERICK ARGUETA LARIOS, a/k/a Lobo,

Defendant, Appellant.

19-1026

UNITED STATES OF AMERICA,

Appellee,

v.

CESAR MARTINEZ, a/k/a Cheche,

Defendant, Appellant.

———————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

———————————

Before

Lynch, Selya, and Barron,
Circuit Judges.

———————————

Madeleine K. Rodriguez, with whom Martin F. Murphy, Christian A. Garcia, and Foley Hoag LLP were on brief, for appellant Herzzon Sandoval.

Michael R. Schneider, with whom Good Schneider Cormier & Fried was on brief, for appellant Edwin Guzman.

Thomas J. Iovieno on brief for appellant Erick Argueta Larios.

Stephen Paul Maidman for appellant Cesar Martinez.

Mark T. Quinlivan, Assistant United States Attorney, with whom Andrew E. Lelling, United States Attorney, was on brief, for appellee.

———————————

July 7, 2021

———————————

**BARRON**, <u>**Circuit Judge**</u>.    In these consolidated appeals, Herzzon Sandoval, Edwin Guzman, Erick Argueta Larios, and Cesar Martinez challenge their federal convictions and sentences, which stem from a wide-ranging federal criminal investigation into La Mara Salvatrucha ("MS-13") in Massachusetts.  We affirm.

## I.

MS-13 is a transnational criminal organization based in El Salvador.  In the United States, MS-13 is organized into small local groups called "cliques."  The Federal Bureau of Investigation ("FBI"), the Massachusetts State Police ("MSP"), and other law enforcement agencies (together, "the Task Force") began an investigation into MS-13 cliques in Massachusetts in 2012.

As part of this investigation, the FBI developed a cooperating witness, "CW-1," who was able to become a member of the "Eastside Loco Salvatrucha," or "ESLS," which is based in Everett, Massachusetts and held regular meetings at a garage there. Through CW-1's recordings and surveillance, the Task Force identified Sandoval, Guzman, Larios, and Martinez as ESLS members and ESLS as an MS-13 clique.  It also identified Sandoval and Guzman as the "runners" of ESLS, with Sandoval as the group's undisputed leader and "first word" and Guzman as the group's "second word."  The Task Force identified Larios and Martinez as ESLS "homeboys," or full members of the group.

The Task Force determined that a person became a member of ESLS by being "jumped in" or "beaten in" -- a process that involves members forming a circle and beating the individual while someone counts to thirteen.  The Task Force also learned, largely through CW-1's recordings and surveillance, of multiple stabbings and attacks, and at least one murder, against MS-13 rivals -- or "chavalas" -- in which ESLS members were allegedly involved.

In investigating the MS-13 cliques in Massachusetts, the Task Force used an undercover technique known as a "protection detail."  Pursuant to this technique, CW-1 would recruit an individual to protect drug shipments that CW-1 transported from Massachusetts to New Hampshire, in exchange for five hundred dollars.  CW-1 recruited both Larios and Martinez for drug protection details.

On May 15, 2017, a federal grand jury in the District of Massachusetts returned a fifth superseding indictment ("FSI") related to the Task Force's investigation.  This indictment charged over fifty individuals with federal crimes, including the four defendants who bring the present appeals.

The indictment charged Sandoval, Guzman, Larios, and Martinez with violating 18 U.S.C. § 1962(d), which makes it a crime to conspire to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.  The indictment identified the conspiracy with which each of these

- 4 -

defendants was charged as one that sought to violate § 1962(c) of RICO. That provision makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Id.

"[R]acketeering activity" includes, among other things, "any act or threat involving murder . . . which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1). The indictment specified that the agreed-upon pattern of activity for each defendant consisted of the following acts "involving murder": murder, Mass. Gen. Laws ch. 265, § 1; assault with intent to murder, id. § 15; attempt to murder, id. § 16; armed assault with intent to murder, id. § 18; and conspiracy to commit murder, Mass. Gen. Laws ch. 274, § 7. The indictment also charged both Larios and Martinez with an additional crime -- conspiracy to possess with intent to distribute and to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846.

On April 6, 2017, the District Court established four separate trial groups for the defendants charged in the FSI. Sandoval, Guzman, Larios, and Martinez were placed in trial group three, which meant that they would be tried jointly.

The joint trial of these four defendants began on January 30, 2018. The jury heard testimony from members of the Task Force and from two cooperating defendants -- Jose Hernandez Miguel ("Hernandez Miguel") and Mauricio Sanchez ("Sanchez") -- who had been ESLS homeboys. The government's case also included recordings -- both audio and video -- that CW-1 had made of ESLS meetings and conversations with MS-13 members.

After fifteen days of trial and four days of deliberation, the jury convicted Sandoval, Guzman, and Larios of violating 18 U.S.C. § 1962(d) but acquitted Martinez on the count that charged him with that crime. The jury's verdict finding Sandoval, Guzman, and Larios guilty of committing that offense did not specify which racketeering acts the jury had found each of these defendants had agreed would be committed.

The jury found Martinez guilty of conspiracy to possess with intent to distribute and to distribute cocaine, finding five-hundred grams or more attributable to and reasonably foreseeable to him. The jury did not, however, find Larios guilty on the count that charged him with committing that offense.

The District Court entered the judgments of conviction and sentenced the defendants in late 2018. Sandoval received a sentence of 240 months' imprisonment and 3 years of supervised release; Guzman, 192 months' imprisonment and 3 years of supervised release; Larios, 180 months' imprisonment and 3 years of supervised

release; and Martinez, 72 months' imprisonment and 5 years of supervised release.

II.

We begin with the sufficiency-of-the-evidence challenges that Sandoval, Guzman, and Larios bring to their respective convictions under 18 U.S.C. § 1962(d). We conclude that these challenges are without merit.

A.

To secure a conviction for committing the RICO conspiracy offense at issue for each defendant, the government was required to prove beyond a reasonable doubt that the defendant "knowingly joined the conspiracy, agreeing with one or more coconspirators 'to further [an] endeavor which, if completed, would satisfy all the elements of" the predicate RICO offense. United States v. Rodríguez-Torres, 939 F.3d 16, 23 (1st Cir. 2019) (quoting Salinas v. United States, 522 U.S. 52, 65 (1997)). Section 1962(c) is the predicate RICO offense for the RICO conspiracy offense that each defendant was charged with committing, and it contains three main elements: "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity," Salinas, 522 U.S. at 62.

The "pattern of racketeering" element of that offense "requires at least two acts of racketeering activity" within ten years of each other. 18 U.S.C. § 1961(5). Thus, to prove the

- 7 -

RICO conspiracy charge at issue for each defendant, the government was required to prove beyond a reasonable doubt that each "agreed that at least two acts of racketeering would be committed in furtherance of the conspiracy." United States v. Leoner-Aguirre, 939 F.3d 310, 317 (1st Cir. 2019).

The government contends that a rational jury could conclude from the evidence in the record that Sandoval, Guzman, and Larios each agreed that at least two acts of racketeering would be committed in furtherance of the conspiracy charged. In support of this contention, the government relies on the evidence in the record that pertains both to each defendant's ties to ESLS and to ESLS being an MS-13 clique whose mission was for its members to attack and kill rivals. In the government's view, the evidence of the ties between each defendant and ESLS, when combined with the evidence of ESLS's murderous mission and connection to MS-13 as well as the evidence that the government introduced about the nature of MS-13 itself, suffices to permit a reasonable juror to find beyond a reasonable doubt that each defendant had entered into the requisite agreement with respect to racketeering acts involving murder.

After the government presented its case-in-chief, Sandoval, Guzman, and Larios moved for judgment of acquittal on the counts charging them with conspiring to violate § 1962(c). Fed. R. Crim. P. 29(a). Then, at the close of all evidence, the

District Court deemed these defendants to have renewed their motions for judgment of acquittal. The District Court ultimately denied the motions.

We review preserved challenges to the sufficiency of the evidence de novo. See United States v. McLellan, 959 F.3d 442, 457 (1st Cir. 2020). We consider the evidence in the record in the light most favorable to the jury's guilty verdict, Rodríguez-Torres, 939 F.3d at 29, and inquire whether on that view of the record "no levelheaded jury could have found [the defendants] guilty," United States v. Guerrier, 669 F.3d 1, 7 (1st Cir. 2011).

**B.**

We begin with Sandoval's sufficiency challenge. He does not dispute that the evidence suffices to show that he was the leader of ESLS, that ESLS was an MS-13 clique, and that, as the indictment alleged, MS-13 is an "enterprise" for purposes of RICO. He also does not dispute that if the evidence suffices to show that he, as an ESLS member, agreed that two or more murders of ESLS rivals would be committed by members of ESLS, then the evidence suffices to show that he committed the charged RICO conspiracy offense.[1] He contends nonetheless that his RICO

---

[1] Sandoval did argue in his opening brief that the government was required to prove that he personally committed or agreed to commit two or more predicate acts. As the government points out, the Supreme Court of the United States rejected this standard in Salinas, 522 U.S. at 65-66. The government thus argues that Sandoval waived an argument that the government failed to meet the

- 9 -

conspiracy conviction must be reversed for insufficient evidence, because he argues that the evidence in the record does not suffice to show that he entered into such an agreement. We are not persuaded.

The jury heard evidence that Sandoval, as the leader or "first word" of the ESLS clique, stated in a conversation with a prospective ESLS member, Hernandez Miguel, that "when one is jumped into MS-13, one is aware that one is jumped in to kill or to look for chavalas." Moreover, Hernandez Miguel testified that Sandoval made that statement to him in the course of a discussion that Sandoval had with him about what it would mean for him to "run with" ESLS, and Sandoval does not dispute that the evidence suffices to show that ESLS was the MS-13 clique that he led. The government also introduced evidence that supportably shows that while Sandoval was leading ESLS, its members committed, participated in, or assisted MS-13 members who were not themselves members of ESLS in (1) a 2008 attack near Maverick Square in East Boston on rivals of ESLS; (2) a December 14, 2014 shooting in

---

standard set forth in Salinas and Leoner-Aguirre -- proof that the "defendant agreed that at least two acts of racketeering would be committed in furtherance of the conspiracy," Leoner-Aguirre, 939 F.3d at 317 (emphasis omitted). Sandoval does cite this standard in his reply brief and maintains that the evidence was insufficient to show even agreement of this sort. For present purposes, we will treat this argument as preserved, given that Sandoval's sufficiency challenge cannot succeed even if it is. See United States v. Leavitt, 925 F.2d 516, 517 (1st Cir. 1991).

Chelsea, Massachusetts, in which Javier Ortiz, an ESLS rival, was killed; (3) a May 12, 2015 stabbing in Boston's Highland Park of a rival gang member; (4) a December 27, 2015 attack on a rival gang member in Chelsea; and (5) a January 1, 2016 stabbing of a rival gang member in Chelsea.

What is more, the government introduced evidence that supportably shows that Sandoval spoke at CW-1's request with yet another individual, Joel Martinez, on December 6, 2015, about his possibly joining the ESLS clique and that thereafter this additional prospective ESLS member was involved in carrying out both the December 2015 and the January 2016 attacks referenced above. The evidence at trial supportably shows, moreover, that this conversation between Sandoval and Joel Martinez about the latter joining ESLS occurred at a time when Sandoval knew that -- or at least was operating under the impression that -- Joel Martinez had recently killed Irvin de Paz, who was described as a "chavala." Indeed, the evidence supportably shows that Sandoval explained to Joel Martinez in the conversation about his becoming a member of ESLS that, because everyone in ESLS would have to agree to him joining the clique, the other ESLS members wanted to meet him, let him "find out to how [ESLS] think[s] as a group," and make sure that his "way of thinking coordinates with [ESLS's]."

It is thus significant that credible evidence introduced at trial supportably shows that when ESLS members met the following

month, on January 8, 2016, to discuss jumping Joel Martinez into the clique, Luis Solis Vasquez, an ESLS member, mentioned that Joel Martinez had committed two attacks "in a short time."  It is significant, too, that evidence in the record supportably shows that Sandoval then told the group at that meeting that "[Joel Martinez] was doing the things that he's supposed to be doing," and that Joel Martinez was jumped in as a "homeboy" for ESLS that same day.

Considered as a whole, the evidence reviewed above suffices to permit a rational juror to find that the mission of ESLS, as an MS-13 clique, was to murder and attempt to murder its rivals, that Sandoval knew that this was ESLS's mission, and that he agreed to facilitate that mission through his leadership role in that clique.  Given that the conspiracy offense set forth in 18 U.S.C. § 1962(d) does not require the government to prove that the charged acts of racketeering were actually committed by either the defendant charged with the conspiracy or by others, Salinas, 522 U.S. at 65; Rodríguez-Torres, 939 F.3d at 29 ("All the government need show is that the defendant agreed to facilitate a scheme in which a conspirator would commit at least two predicate acts, if the substantive crime occurred." (emphasis added)), no more evidence was needed to support a finding by a reasonable juror that the agreement element of this conspiracy offense had been proved beyond a reasonable doubt, see United States v. Cianci, 378

- 12 -

F.3d 71, 90 (1st Cir. 2004) (explaining that "[t]he conspiratorial agreement need not be express so long as its existence can plausibly be inferred from the defendants' words and actions and the interdependence of the activities and persons involved" (alteration in original) (quoting United States v. Boylan, 898 F.2d 230, 241-42 (1st Cir. 1990))). We therefore reject Sandoval's sufficiency challenge to his RICO conspiracy conviction.

## C.

Guzman's sufficiency challenge to his § 1962(d) conviction necessarily fails insofar as it rests on contentions like those that we have just rejected. But, Guzman does also make some additional arguments that we must separately address.

First, Guzman argues that the evidence at trial indicated that the mission of MS-13 was to "look for," "stab," or "attack" rivals, or to "commit generic 'violence,'" but that none of this conduct itself constitutes an act of racketeering. He thus contends that the evidence of the requisite "agreement" that two or more acts of racketeering would be committed in furtherance of the conspiracy was insufficient in his case.

Guzman supports this contention with precedents in which the jury was presented with alternative theories of guilt, one of which was legally invalid. E.g., United States v. Nieves-Burgos, 62 F.3d 431, 435-36 (1st Cir. 1995) (explaining the rule that when a "jury returns a guilty verdict on an indictment charging several

- 13 -

acts in the conjunctive," the verdict must be set aside where "one of the possible bases of conviction was legally erroneous" and it "is impossible to tell which [basis] the jury selected" (first quoting Turner v. United States, 396 U.S. 398, 420 (1970); and then quoting Yates v. United States, 354 U.S. 298, 312 (1957))). Here, however, the District Court clearly instructed the jury about which RICO predicate acts the government had to prove the defendants agreed that a member of the conspiracy would commit and explained that those acts did not include armed assault with intent to kill, assault and battery, or assault and battery with a dangerous weapon. Thus, there is no force to this aspect of Guzman's challenge, at least so long as the evidence suffices to permit a reasonable juror to find that the mission of ESLS was to commit racketeering acts that were charged in the indictment, such as murder and assault with intent to murder.

Guzman does also contend that the evidence shows that he "joined ESLS as a young man at a time when far fewer violent acts were being committed" and that, by the time that the Task Force investigation was underway, he "had become a hardworking, married man with children, who sought to distance himself from the violent acts" of the more violent members who "resented him and targeted him." Guzman thus likens his situation to that of the defendant in the Fourth Circuit's unpublished decision in United States v. Barnett, 660 F. App'x 235 (4th Cir. 2016), which ruled that the

defendant's association with a gang was insufficient to show that she agreed to the commission of racketeering acts.  Id. at 248.

But, as we have explained, the evidence suffices to show that the very mission of ESLS included the commission of the predicate racketeering acts involving murder.  Moreover, the jury heard testimony from Hernandez Miguel about an episode some time before he was removed to El Salvador in 2009 in which he and Guzman "smashed [a chavala's] face with beer bottles" and about Guzman providing him with clean clothes after the May 12, 2015 stabbing in which Hernandez Miguel had participated.  Thus, even if, as Guzman contends, neither of these incidents itself involved the commission of a charged racketeering act, the testimony from Hernandez Miguel about those incidents -- especially given the recency of the second of them -- still suffices to support a plausible inference that Guzman was aware that ESLS's mission came to include murder or attempted murder of rival gang members during the course of his membership in it.  After all, jurors are permitted to make reasonable inferences, drawing on common sense, about such matters as whether a member of a gang that has been shown to have a mission of killing or attempting to kill rivals would have known of that mission if he was involved in it as a member both in helping to commit a violent attack on a rival and in helping a member clean up after stabbing a rival.  Accordingly,

- 15 -

we reject Guzman's sufficiency challenge to his conviction for violating § 1962(d).

D.

The last of the sufficiency challenges that we must address is the one that Larios brings. He contends that the evidence about the mission of MS-13 and ESLS cannot support a finding of the requisite agreement as to him not only because of when he joined the clique but also because there was no evidence that he held a leadership position in it. In particular, Larios contends that any inferences that could permissibly be drawn from Hernandez Miguel's testimony about how Hernandez Miguel understood the goals of the ESLS clique in 2009 would not suffice to permit a similar inference to be drawn about how Larios understood that clique's mission during his membership in it, given that Larios joined that clique years later in 2013. Larios asserts in this regard that the only evidence that the government presented that described the goals and mission of ESLS or MS-13 as of the time that Larios joined the clique was Sanchez's testimony that the rules when he joined in 2013 were (1) "[a]ttend the meetings"; (2) "[n]ot let a homeboy down"; and (3) "[r]epresent [MS-13] through colors" and "be[] solid" with MS-13.

This argument fails to account, however, for all the evidence in the record. For example, Sanchez went on to explain in his testimony that "being solid" with MS-13 meant having the

- 16 -

organization's respect, which one earned by "[d]oing hits on the rivals and the chavalas."  Thus, there is evidence that at the time Larios joined the clique in 2013, respect was earned by "doing hits."  And, the evidence also supportably shows that Larios was present at Joel Martinez's jump-in and for the discussions about Joel Martinez's attacks on rival gang members that preceded it. In addition, the jury heard evidence both that Larios requested a "green light" from Sandoval to kill CW-1, on suspicion that CW-1 was an informant, in 2015 and that Larios was given a clique handgun around 2014 or 2015 after he had been shot at by chavalas, so that "he could also shoot."

Accordingly, we conclude that the evidence, when considered as a whole and in the light most favorable to the jury's verdict, Guerrier, 669 F.3d at 7, suffices to support an inference that Larios knew that such killings and attempted killings of rivals were part of MS-13's practice and mission and that he agreed to further that mission as a member of ESLS -- indeed, by committing predicate acts himself if need be.  We therefore conclude that a rational jury could find beyond a reasonable doubt that Larios agreed that at least two acts of murder or attempted murder would be committed in furtherance of the conspiracy.

## III.

Sandoval, Guzman, and Larios next contend that even if their sufficiency challenges fail, their convictions must be

vacated due to the District Court's error in denying a motion for a continuance due to pretrial publicity. These same three defendants then separately bring a related challenge, which Martinez also joins on appeal, to the District Court's denial of a motion for a mistrial due to certain questions jurors raised regarding their safety after the trial was underway. They contend that this error, too, requires that their convictions be vacated. We find no merit, however, to either of these claims of error, which we consider in turn.

**A.**

We start with the challenge based on the denial of the continuance motion. We describe the relevant facts and procedural history before turning to our analysis of the merits.

**1.**

On the evening of the first day of jury empanelment -- January 30, 2018 -- President Trump delivered his State of the Union address. The next morning, Sandoval moved to continue the trial until March 2018 to "permit the impact of the President's remarks to dissipate."

The motion contended that the President's address "sharply condemned MS-13," describing its members as "savage" and its crimes as "brutal[]." The motion also highlighted the fact that media coverage of the address included emotional footage of grieving families whose children were said to have been murdered

by MS-13 members and whom the President had invited to the Capitol for the address.

The District Court denied the motion, in which Larios and Guzman had joined. The District Court indicated that it would ask the jurors an open-ended question about whether they had "heard or seen anything about MS-13," and it then proceeded to ask the jurors if any of them had "learned or seen or read anything about MS-13 prior to coming into court" that day. In response, seven prospective jurors -- none of whom were empaneled -- specifically mentioned the State of the Union address.[2]

**2.**

The three defendants who join in this challenge on appeal -- Sandoval, Guzman, and Larios -- argue that the steps that the District Court took to address the concern about pretrial publicity raised in the motion were inadequate and that, even though none of the empaneled jurors mentioned hearing or seeing the President's statements, the District Court should have presumed prejudice among the members of the jury pool as a result of the media coverage of President Trump's comments about MS-13. The three defendants

---

[2] One juror had already mentioned "hear[ing] the President's speech last night" in response to another question; this juror was also not empaneled.

- 19 -

thus contend that the District Court abused its discretion in denying the motion for a continuance.[3]

We may assume that all three defendants preserved their challenge to the denial of this motion, such that our review of that denial is for manifest abuse of discretion, see West v. United States, 631 F.3d 563, 568 (1st Cir. 2011). For, as we will explain, even under that standard of review, the challenge is without merit.

These defendants rely chiefly on our pretrial publicity cases in arguing that the District Court erred in not presuming prejudice. But, while those cases provide that prejudice should be presumed "where 'prejudicial, inflammatory publicity about [a] case so saturated the community from which [a defendant's] jury was drawn as to render it virtually impossible to obtain an impartial jury,'" United States v. McNeill, 728 F.2d 5, 9 (1st Cir. 1984) (alterations in original) (quoting United States v. Chagra, 669 F.2d 241, 250 (5th Cir. 1982)),[4] none of the cases

---

[3] The defendants do not make any claim that the District Court conducted an inadequate voir dire. Cf. United States v. Tsarnaev, 968 F.3d 24, 56-62 (1st Cir. 2020), cert. granted, 141 S. Ct. 1683 (2021); United States v. Lazo, 816 F. App'x 752, 760-62 (4th Cir. 2020) (considering requested voir dire questions in an MS-13 case in light of the 2018 State of the Union address).

[4] The case law also establishes a second approach to presuming prejudice, which permits the presumption "where 'enough jurors admit to prejudice to cause concern as to any avowals of impartiality by the other jurors.'" United States v. Casellas-Toro, 807 F.3d 380, 386 n.3 (1st Cir. 2015) (quoting United States v. Orlando-Figueroa, 229 F.3d 33, 43 (1st Cir. 2000)). The

- 20 -

these defendants cite establishes that the presumption of prejudice must (or even may) be applied when the pretrial publicity did not concern the particular defendants in the case, cf., e.g., United States v. Casellas-Toro, 807 F.3d 380, 388 (1st Cir. 2015) (presuming that pretrial publicity prejudiced defendant in federal prosecution where there was "'[m]assive' and 'sensational' publicity" of the defendant's state trial for "an intertwined, heinous crime"). Nor are we aware of any other authority that supports the application of such a presumption in these circumstances.

Moreover, although the government's case against these defendants on the RICO conspiracy charge that each faced did rely in significant respects on evidence concerning the nature of MS-13 as a transnational criminal organization, that case ultimately depended on what the evidence showed about each of their ties to ESLS and their knowledge of the mission of that particular MS-13 clique rather than merely on the nature of MS-13 itself. Thus, given the District Court's voir dire and its instructions repeatedly reminding the jury that it was required to consider each defendant's guilt individually, we reject the contention that the District Court abused its discretion in denying the motion for the continuance. See McNeill, 728 F.2d at 9 ("Even setting aside

---

defendants make no argument for a presumption of prejudice on this ground.

- 21 -

for a moment the significant fact that . . . newspaper articles focused on another person (albeit one in a similar predicament), the contents of those articles would not have the inevitable result of convincing prospective jurors that McNeill was guilty as charged.").

## B.

We next consider the challenge that all four defendants -- including Martinez -- bring to the District Court's denial of a motion for a mistrial that was based on an alleged "climate of fear" among the jurors. Here, too, we conclude that the District Court did not manifestly abuse its discretion. See United States v. Chisholm, 940 F.3d 119, 126 (1st Cir. 2019).

## 1.

On the fourth day of trial, during which the government presented testimony that MS-13's "position concerning informants" was that its members would kill them, the District Court received two notes from jurors. One of the notes asked whether jurors' names would be made public or made available to the defendants. The other note asked, "Should I worry about my safety[?]"

As the trial progressed, the government asked Hernandez Miguel during his testimony on February 8, 2018, what he thought MS-13 would do to him as a result of his testimony. He responded that the rules of MS-13 provide that when someone testifies against another member of that organization, its members will "kill him

and also kill his family." Hernandez Miguel then went on to say that "if something happens to my family, it will be their fault," and the District Court struck that statement.

The next day the District Court informed counsel that it had received two additional notes from jurors expressing concerns about their own safety. One of these notes asked whether the jurors' identities were being revealed to the defendants. The other note asked whether there were known cases of MS-13 affiliates harming jurors -- or the families of jurors -- who had to deliberate about crimes committed by other MS-13 members and stated that "[t]his is a concern of multiple jurors."

In response, the District Court addressed the jurors, without the defendants present (but with their attorneys in attendance). The District Court told the jurors that there was "no reason for concern" and no reason to believe that there was a threat of violence to any of them. The District Court further explained to the jurors at that time that actions had been taken to protect their anonymity, and the District Court reminded the jurors that they were obliged to render a verdict without any fear of consequences and that they were not to discuss the case among themselves prior to deliberations. The District Court then conducted an individual voir dire to ask the jurors whether they thought they could still render a fair verdict and to discuss any remaining concerns.

The District Court discharged one juror based on that individual's responses to the individual voir dire.[5]  All of the remaining jurors had confirmed during that voir dire that they would be able to render a fair verdict without fear of consequences, with the exception of one juror who indicated that he was "95 percent confident that he could do so."  That juror was an alternate, however, who did not participate in returning the verdict in this case.

At the end of the process, Sandoval's counsel moved for a mistrial.  He pointed to an alleged "climate of fear" reflected by the notes from the jurors, as well as both an "undercurrent of discussion about the testimony" despite the Court's instructions and what he alleged was a lack of candor in some jurors' voir dire responses.  The other defendants joined this motion, which the District Court denied.

**2.**

A trial judge has "wide discretion" in responding to concerns about juror impartiality and determining appropriate remedial measures to ensure it.  United States v. Tejeda, 481 F.3d 44, 52 (1st Cir. 2007) (quoting United States v. Rodríguez-Ortiz, 455 F.3d 18, 23 (1st Cir. 2006)).  In this case, the District Court had the opportunity to "observe[] the demeanor of each juror,"

---

[5] This dismissal did not appear to be entirely related to a fear of consequences.

id., and stated that it was "confident based on the voir dire," the instructions given, and the jurors' reaction to the instructions that the jurors would be able to reach a fair and impartial verdict. Because the trial judge is usually in the best position to make such a determination, "'it is only rarely -- and in extremely compelling circumstances -- that [we], informed by a cold record, will venture to reverse a trial judge's on-the-spot decision' that the interests of justice do not require aborting an ongoing trial." Chisholm, 940 F.3d at 126 (alteration in original) (quoting United States v. Georgiadis, 819 F.3d 4, 16 (1st Cir. 2016)). We see no basis on this record for concluding that the interests of justice would require that extreme consequence here, given the steps that the District Court took to address the concern reflected in the notes from jurors.

The defendants do assert that the District Court's remedial actions were demonstrably insufficient. They point out that one week after the individual voir dire responding to jurors' expressions of fear, the District Court received a note from a juror that indicated that one juror had attempted on multiple occasions to engage other jurors -- who were following instructions -- in conversation about the case, despite the District Court's emphasis during the individual voir dire on not discussing the case. Cf. Tejeda, 481 F.3d at 53 (explaining that court instructed the jury not to discuss threatening incident and that "those who

were later questioned said the jurors had complied with that instruction").

But, the District Court investigated this issue, including by following up with that very juror, who indicated to the District Court in response that there had been no discussion of the merits of the case and that he was not attempting to sway or deliberate with other jurors. The District Court then went on to remind that juror of the critical importance of not engaging in any discussion about the case of any kind prior to the jury's deliberations, and no defendant thereafter objected to the handling of the issue.[6] We thus conclude that the District Court did not abuse its considerable discretion in declining the "last-resort remedy" of ordering a mistrial. Chisholm, 940 F.3d at 126.

## IV.

We turn our focus, then, to a set of challenges that Sandoval, Guzman, and Larios bring concerning the testimony of FBI Supervisory Special Agent Jeffrey Wood, as they contend that their convictions must be vacated in consequence of errors that were made with respect to admitting the testimony that he provided at trial. Once again, we conclude that the challenges fail.

---

[6] Nor do the defendants point to any expressions of fear from the jurors after that individual voir dire on February 9, 2018.

- 26 -

**A.**

We first consider Sandoval, Guzman, and Larios's contention that the District Court abdicated its gatekeeping role in permitting Wood to testify as an expert regarding MS-13. We do not agree.

A trial court's gatekeeping obligation with respect to the admission of expert testimony applies to nonscientific evidence, Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999), and the parties here agree that the District Court had such an obligation with respect to Agent Wood's testimony about MS-13 and the nature of its operations. But, our review of whether the District Court's manner of performing its gatekeeping function amounted to an abdication of that role is only for abuse of discretion, see United States v. Phillipos, 849 F.3d 464, 471 (1st Cir. 2017), and we conclude that there was none with respect to the District Court's assessment of Agent Wood's ability to testify as an expert, see United States v. Lopez-Lopez, 282 F.3d 1, 14 (1st Cir. 2002) (finding "no reason to believe that the district court somehow failed to perform its gatekeeping function" where, "outside of the presence of the jury, . . . [it] heard defense counsel's objections" and found that the agent's "testimony was based on his experience"); United States v. Diaz, 300 F.3d 66, 73-74 (1st Cir. 2002) (explaining that there is "no particular

procedure that the trial court is required to follow in executing its gatekeeping function").

Before trial, the government informed the defense that it would offer expert testimony regarding the history, structure, and organization of MS-13. Sandoval, Larios, and Martinez all moved in limine to exclude the proposed expert testimony. At the final pretrial conference, the District Court carefully considered the defendants' motions in limine and Sandoval's request for a Daubert/Kumho hearing with respect to Agent Wood testifying as an expert, which was premised on the notion that such a hearing could provide more information about the qualifications and trainings listed in the expert disclosure.

The government maintained, however, that no hearing was necessary to determine Wood's qualifications to so testify. It noted in that regard the detailed expert disclosure that had been made regarding Wood's qualifications and the availability of his testimony in an earlier trial before the District Court stemming from the same investigation.

Notwithstanding the government's contention that there was no need for a hearing on Agent Wood's qualifications, the District Court permitted the defendants to seek additional information about Wood's background and the basis for his testimony. Furthermore, the District Court indicated that it would

revisit whether to hold a voir dire of Wood on the basis of that information.

Then, on the first day of trial, the District Court ruled that the background information about the operation of MS-13 was an appropriate subject of expert testimony. It acknowledged that, as in other cases in which expert testimony aids the jury in understanding the operation of complex criminal schemes, the knowledge is "not acquired due to some kind of scientific methodology" but instead is based on law enforcement trainings and materials and information gained in the course of investigation. The District Court found this foundation of knowledge to be an appropriate basis for expert testimony on issues like MS-13's hierarchy and structure and indicated that cross-examination and objections could ensure that Agent Wood was not drawing inappropriate conclusions from unduly small data sets in providing his testimony on those topics as an expert witness. Finally, the District Court found that Wood's background and experience sufficed to enable him to testify about MS-13's history, structure, organization, rituals, rivals, and mission, due to knowledge that he had accrued through speaking to law enforcement professionals and cooperators and reviewing videos, photographs, and law enforcement presentations and materials.

We have recognized that in the law enforcement field an "expert's experience and training bear a strong correlation to the

reliability of the expert's testimony." United States v. Martinez-Armestica, 846 F.3d 436, 444 (1st Cir. 2017) (quoting United States v. Jones, 107 F.3d 1147, 1155 (6th Cir. 1997)); see also Fed. R. Evid. 702 advisory committee note to 2000 amendments ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."). The record suffices to show that Wood's "training and experience support the reliability of his testimony" regarding those general matters concerning MS-13's operations, Martinez-Armestica, 846 F.3d at 445, as the record shows that he had significant experience investigating MS-13, reviewing information about MS-13, and speaking to law enforcement officials and MS-13 members about the organization and the way that it functions.

The three defendants who join this challenge nonetheless contend that there was insufficient information put forward in support of Wood testifying as an expert about, for example, how many individuals had spoken with him and the percentage of those conversations that supported his opinions and conclusions concerning MS-13. But, these defendants cite no authority providing that a district court must conduct a probing inquiry of that degree of intensity into an expert witness's expertise when it is founded on that witness's experience, as Wood's is. Moreover, the District Court permitted the defense at trial to elicit information about the underlying conversations that Agent

Wood asserted informed his expert opinions regarding the operations of MS-13 so that the jury could factor that into its assessment of the weight to be accorded to Wood's testimony. Thus, we reject the claim that the District Court abused its discretion in permitting Wood to provide expert testimony by failing to fulfill its gatekeeping role. See Martinez-Armestica, 846 F.3d at 445.

## B.

These same three defendants next contend that the District Court erred by permitting Wood to provide testimony that went beyond the scope of proper expert testimony. Here, too, we review for abuse of discretion. See United States v. Montas, 41 F.3d 775, 783 (1st Cir. 1994).

The defendants distinguish between what they call "conventional topics of gang testimony" -- information about MS-13's structure, organization, history, colors, tattoos, and rivals -- and other subjects "highly prejudicial" to the defendants. But, the testimony that the defendants contend falls into this latter category -- specifically, information about the mission of MS-13, the requirements to join MS-13, MS-13's treatment of suspected informants, and the interactions between El Salvador and U.S. MS-13 cliques -- was fairly within the scope of the information about MS-13's modes of operation generally. And that is a subject that the District Court reasonably found to be one for which expert

- 31 -

testimony would aid the jury and one on which Wood was qualified to testify. See Montas, 41 F.3d at 783 ("We have admitted expert testimony regarding the operation of criminal schemes and activities in a variety of contexts, finding such testimony helpful to juries in understanding some obscure or complex aspect of the crime."); United States v. Angiulo, 897 F.2d 1169, 1189 (1st Cir. 1990) (upholding admission of expert testimony that "assist[ed] the jury to understand the often complex structure of organized crime activities"); see also, e.g., United States v. Mejia, 545 F.3d 179, 189-90, 195 (2d Cir. 2008) (collecting cases upholding law enforcement officers' expert testimony on topics like "membership rules" and "organizational hierarchy" and explaining that the decision to permit such expert testimony "reflects [the] understanding that . . . law enforcement officers may be equipped by experience and training to speak to the operation, symbols, jargon, and internal structure of criminal organizations"); United States v. Rios, 830 F.3d 403, 413-16 (6th Cir. 2016) (explaining that law enforcement experts in organized crime cases "may properly give expert testimony 'on the structure, the organization, [and] the rules' of the organized-crime entity" but distinguishing testimony as to "specific criminal actions," as that information is "well within the average juror's ability to understand" (alteration in original) (quoting United States v. Tocco, 200 F.3d 401, 418 (6th Cir. 2000))); United States v. Garcia, 793 F.3d 1194,

1213 (10th Cir. 2015) (noting that "[e]xpert testimony about a gang's history, territory, colors, hand signs, graffiti use, naming practice, tattoos, structure, membership rules, and similar sociological evidence can assist the jury in understanding and evaluating evidence concerning the specific crimes charged," but distinguishing testimony about specific events).

That some of Wood's expert testimony about the rules and operation of MS-13 was more prejudicial than other forms of general gang testimony also does not mean, as the defendants suggest, that it was necessarily improper as expert testimony. The District Court acted within its discretion in determining that the testimony's prejudicial effect did not substantially outweigh the testimony's probative value. See Montas, 41 F.3d at 784 ("[T]he trial court enjoys vast discretion in deciding whether to admit expert testimony under Rules 702 and 403."); see also Angiulo, 897 F.2d at 1189 (upholding expert testimony about defendants' roles in the criminal organization, recognizing that "although this type of testimony posed some risk of prejudicing the defendants, it was particularly helpful in assisting the jury to understand the often complex structure of organized crime activities").

We also reject the contention that the District Court abused its discretion in admitting Wood's testimony insofar as that contention is premised on the fact that some of that testimony was not proper for an expert witness to provide because it did not

constitute expert opinion at all and instead constituted testimony that only a fact witness could give. The problem with this contention is that Wood testified not only as an expert about MS-13's operations but also as a fact witness due to his role on the Task Force that conducted the investigation into ESLS. Compare United States v. Flores-De-Jesús, 569 F.3d 8, 26 (1st Cir. 2009) ("[Agent's] testimony was permissible to the extent that he was testifying either 1) as a case agent describing the course of the investigation and events in which he had personally participated, or 2) as an expert whose testimony provided background and context on drug conspiracies and distribution in public housing projects in Puerto Rico."), with Mejia, 545 F.3d at 196 (noting that the witness "was proffered and testified . . . only as an expert," such that the "parts of his testimony that involved purely factual matters, as well as those in which [he] simply summarized the results of the Task Force investigation, fell far beyond the proper bounds of expert testimony").

To be sure, "'courts must be mindful when the same witness provides both lay and expert testimony' because of the heightened possibility of undue prejudice," which is a concern that "is especially acute where the dual roles of expert and fact witness are filled by a law enforcement official." Flores-De-Jesús, 569 F.3d at 21 (citation omitted) (quoting United States v. Upton, 512 F.3d 394, 401 (7th Cir. 2008)). But, there is no per

se prohibition against a witness testifying in both capacities. See id. Moreover, the District Court explained to the jury that Wood was "testifying about what he did in the course of th[e] investigation" and that "because of his training and education, he knows certain things about MS-13." It further instructed the jury to be mindful of distinguishing those roles in evaluating a witness's testimony and clarified at certain points that Wood was testifying as to a general proposition based on his claimed "special knowledge" about the gang generally and not about the individual defendants. The District Court also directed the government to make that line clear, and Wood was not referred to as an expert before the jury. See United States v. Garrett, 757 F.3d 560, 569 (7th Cir. 2014) (noting that in the case of such dual-capacity witnesses, "[a]voiding the use of the term 'expert' goes a long way in reducing the possibility that jurors will attach 'undue weight' to the testifying officer's fact testimony" (quoting United States v. Cheek, 740 F.3d 440, 447 (7th Cir. 2014))). Thus, there was no abuse of discretion on this score either.

## C.

We move on, then, to Sandoval, Guzman, and Larios's federal constitutional challenge concerning Agent Wood's testimony, which these defendants base on the Confrontation Clause. See U.S. Const. amend. VI. We may assume that this

challenge is preserved as to all three defendants, see United States v. Ramos-González, 664 F.3d 1, 4 (1st Cir. 2011) (counsel's objection concerning witness's lack of personal knowledge sufficiently raised Confrontation Clause issue), because, even on the understanding that our review is de novo, id., the Confrontation Clause challenge still fails.

The defendants broadly assert that Wood's testimony was a regurgitation of conversations that he had with law enforcement officers in the United States and El Salvador. The defendants acknowledge that properly qualified experts whose work is based on reliable principles and methods may rely on inadmissible hearsay evidence in forming an expert opinion without running afoul of the Confrontation Clause in then relaying that opinion, once formed, through their own testimony. See Fed. R. Evid. 703; United States v. De La Cruz, 514 F.3d 121, 133-34 (1st Cir. 2008). But, the defendants contend, Wood's testimony was not the product of "reliable principles and methods" from which he could provide expert opinions drawn from his conversations with law enforcement. Thus, they contend, he necessarily served in providing his testimony merely as a "conduit for testimonial hearsay." Ramos-González, 664 F.3d at 5.

The only portions of Wood's testimony that the defendants appear to challenge concern the information pertaining to MS-13 that Wood obtained in conversation with law enforcement

officers. Nonetheless, the defendants do not point to any particular testimony that conveyed the content of particular interviews or parroted the conclusions of others. See United States v. Johnson, 587 F.3d 625, 635-36 (4th Cir. 2009) (contrasting cases in which experts make "direct reference to the content of . . . interviews" from those in which experts "present[] [their] independent judgment and specialized understanding to the jury"). Instead, they assert that Wood "failed to explain his process for 'amalgamating the potentially testimonial statements.'" Reply Br. of Appellant Herzzon Sandoval 14 (quoting Rios, 830 F.3d at 418).

We have already rejected, however, the defendants' challenge to Wood's testimony based on the contention that the principles and methods that he relied on to form his expert opinion were inadequate to permit him to offer expert testimony. And, given that conclusion, the defendants' acknowledgement that Wood did "amalgamat[e]" the potential information he relied upon fatally undercuts their Confrontation Clause claim. See Rios, 830 F.3d at 418 ("When an expert's understanding of the inner workings of a criminal organization stems in significant part from . . . activities [like interviews and interrogations], courts have agreed that it is the process of amalgamating the potentially testimonial statements to inform an expert opinion that separates an admissible opinion from an inadmissible transmission of

testimonial statements."); see also Mejia, 545 F.3d at 197-98 (recognizing difference between an expert "synthesi[zing] . . . various source materials" and "repeating information he had heard or read"); Garcia, 793 F.3d at 1214 (concluding that gang expert's statement merely "relayed what . . . gang members told him" where it "involve[d] . . . no calibrated judgment based on years of experience and the synthesis of multiple sources of information"). Therefore, even assuming that Wood did rely on testimonial statements in offering his expert testimony regarding MS-13, we find on this record that his testimony did not run afoul of the Confrontation Clause because it reflected his independent judgment, gleaned from years of experience studying MS-13.

**D.**

Sandoval, Guzman, and Larios relatedly contend that the District Court improperly limited the scope of the defense's cross-examination of Wood concerning CW-1 in a way that impaired their rights under the Confrontation Clause. We conclude that this challenge also is without merit.

**1.**

In the early stages of the Task Force's Massachusetts MS-13 investigation, the FBI began developing CW-1 as a cooperating witness. CW-1 was brought to Boston from El Salvador -- the country to which he had been removed after serving a federal prison sentence -- around 2013, and initially posed as a drug dealer.

Hernandez Miguel introduced CW-1 to ESLS and, around 2014, CW-1 was jumped in to the ESLS clique.

Wood was not the case agent when CW-1 was first brought on as an informant or when CW-1 infiltrated the ESLS clique, but he was involved in the investigation as of those times. And, after Wood became the case agent in 2015, he began the process to enter CW-1 into the witness protection program.

Shortly thereafter, according to Wood's testimony, he became aware of information indicating that CW-1 had committed serious violent crimes throughout the course of the investigation. Wood met with CW-1 about these concerns in December 2015, and CW-1 denied involvement. CW-1 was admitted into the witness protection program but was terminated from the program over a year later.

The defendants sought to cross-examine Wood about CW-1's termination from witness protection and about the details of CW-1's "crime spree." The District Court repeatedly questioned the relevance of this information in the absence of CW-1 being called as a witness or the government introducing evidence about the value that CW-1 provided to the FBI or the good things that CW-1 did. The District Court also noted that CW-1, who did not testify, could not be impeached through Wood.

Sandoval's counsel argued in response that the information about CW-1 went to Wood's credibility, as Wood had

"been presented as a person who conducted a detailed thorough investigation" and evidence that a critical witness he relied on was "out there committing crime" under his nose was "relevant to [Wood's] overall credibility." The District Court ultimately ruled that it would permit cross-examination of Wood to "elicit in bare bones fashion that CW-1 committed serious crimes, if this is what happened, during the time that he was a cooperating witness and leave it at that, nothing further."

## 2.

Sandoval, Guzman, and Larios contend that their Confrontation Clause rights were infringed by the District Court's ruling limiting cross-examination of Wood about both CW-1's commission of serious crimes while serving as an informant for the FBI and CW-1's involvement with and termination from the witness protection program. When a challenge to a district court's decision to limit cross-examination has been properly preserved, we review de novo the district court's "conclusion that, even though cross-examination was limited, the defendant was afforded sufficient leeway to establish a reasonably complete picture of the witness' veracity, bias, and motivation." United States v. Jiménez-Bencevi, 788 F.3d 7, 21 (1st Cir. 2015) (quoting United States v. Capozzi, 486 F.3d 711, 723 (1st Cir. 2007)).[7] If this

_____

[7] The government contends that the defendants forfeited their Confrontation Clause claim regarding the limits on Agent Wood's

"threshold is satisfied, we 'review the particular limitations only for abuse of discretion.'"  Id. (quoting United States v. Martínez-Vives, 475 F.3d 48, 53 (1st Cir. 2007)).

We may assume that the challenge at issue has been properly preserved by each defendant, as the District Court's ruling limiting cross-examination of Wood still permitted the defense to "paint for the jury a complete picture" and thus "afforded a reasonable opportunity to impeach" Wood.  Id. (quoting Martínez-Vives, 475 F.3d at 53).  The District Court's ruling did not bar any defendant from using cross-examination to call attention to issues related to the quality of the information that Wood was relying upon, and, more specifically, to raise concerns about the veracity of those he was speaking to when forming his opinions.  The District Court's ruling also did not prevent testimony from being elicited from Wood that he had learned that "CW-1 had committed some serious violent crimes throughout the investigation," that CW-1 had made false representations about these crimes to the FBI, and that CW-1 was ultimately terminated from the witness protection program.  The jury thus was not barred

_____

cross-examination because they argued below only that the proposed questioning was "relevant" as it went to Wood's credibility.  But, this claim necessarily sounds in the Confrontation Clause, which ensures the right to engage in "appropriate cross-examination" to permit the jury to "draw inferences relating to the reliability of the witness."  Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986) (quoting Davis v. Alaska, 415 U.S. 308, 318 (1974)).

-- through the limits on cross-examination of Wood -- from being given "sufficient information from which it could conclude," see Brown v. Powell, 975 F.2d 1, 5 (1st Cir. 1992), that Wood's credibility might be undermined by the fact that he allegedly "missed the fact" that CW-1 had been committing serious crimes and then lied to Wood about doing so.

Nor did the District Court abuse its discretion in imposing the limits that it did on the ability of the defendants through cross examination to elicit the details of CW-1's criminal activity. The defendants contend that the type of questioning that the defense was left to pursue was "simply too vague and opaque" to be effective. But, the District Court had "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, . . . or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). And, the District Court supportably concluded that the line of questioning at issue was irrelevant insofar as it was offered to impeach CW-1, who did not testify, and only marginally relevant insofar as it related to Agent Wood's competence as a case agent or expert. The District Court's subsequent decision to limit the level of detail on the topic also was neither overbroad nor "manifestly unreasonable." United States v. Ofray-Campos, 534

F.3d 1, 36 (1st Cir. 2008) (quoting United States v. Callipari, 368 F.3d 22, 36 (1st Cir. 2004)).

E.

Finally, we consider the same three defendants' Jencks Act claim, 18 U.S.C. § 3500, which concerns a "Threat Assessment" that the FBI prepared as part of the process for admitting CW-1 into the witness protection program. The Jencks Act requires the government, "once a witness has testified, to proffer upon a defendant's timely request any statement of that witness in its possession, whether or not exculpatory, that relates to the subject matter of the witness's testimony." United States v. Sepúlveda-Hernández, 752 F.3d 22, 32 (1st Cir. 2014).

Following the defendants' request, the government ultimately produced a redacted version of the Threat Assessment. Neither the District Court nor the defendants viewed the unredacted document, which the defendants contend may have been a "statement" of Agent Wood for Jencks purposes and thus subject to production under that Act. The defendants argue that the District Court abused its discretion by failing to conduct an independent inquiry into whether the Threat Assessment was Jencks material -- which includes any written statement "made by" "any witness called by the United States" "and signed or otherwise adopted or approved by him," 18 U.S.C. § 3500(e) -- and by failing to order the production of the unredacted document, which was first referenced during

Wood's direct examination when he indicated that filling out a Threat Assessment was one step he took to protect CW-1's family in El Salvador. We review a claim of Jencks error -- which we will assume is preserved as to Sandoval, Guzman, and Larios[8] -- for abuse of discretion. See Sepúlveda-Hernández, 752 F.3d at 33. We find none.

**1.**

Sandoval first sought production of the Threat Assessment before trial. He then moved for the immediate production of the Threat Assessment after Wood mentioned the document in his testimony on the fourth day of trial. Sandoval followed up with a written motion seeking production of "the original Threat Assessment, the amended version, and the special benefits parole package" as "'written statement[s] made by . . . or otherwise adopted or approved by' Special Agent Wood." (alterations in original) (quoting 18 U.S.C. § 3500). The reference to an "amended version" of the Threat Assessment seemingly refers to Wood's representation on cross-examination that he had amended the application for CW-1 to enter the witness protection program after beginning that paperwork in late 2015.

---

[8] Larios purports to join Sandoval's challenges but does not include the Jencks Act claim -- unlike the other claims related to Agent Wood's testimony -- in those challenges that he specifically joins. Nevertheless, we will assume for present purposes that Larios has preserved this claim.

The District Court reviewed a redacted version of the Threat Assessment and, on the fourteenth day of trial, ordered the government to produce a copy under seal.  The unredacted document was not produced under seal, but the defense received a redacted version on the fifteenth day of trial.[9]  After reviewing the redacted copy, the defense objected again to the government's failure to produce the unredacted copy.[10]  The District Court then asked Sandoval's counsel whether he "want[ed] a continuance" or what relief he sought with respect to the Jencks issue.  Sandoval's counsel declined a continuance at that point "given where we are in the trial" but noted that, had the Threat Assessment been timely produced following Wood's testimony, it could have been useful material for cross-examination of Wood.  The District Court overruled the objection.

**2.**

The District Court did not determine whether the Threat Assessment was producible under the Jencks Act.  The defendants contend that the failure to make that determination was an abuse

---

[9] When the District Court asked whether there was an "amended Threat Assessment," the government responded, "Judge, this is what I got from Washington."  There was no further inquiry into whether there was a version of the document other than the redacted version the government provided.

[10] The defendants do not argue that the failure to produce an unredacted version was failure to comply or election not to comply with a court order under the Jencks Act, see 18 U.S.C. § 3500(b)-(d), presumably because no Jencks determination had been made.

- 45 -

of discretion.  And, although the Jencks Act does not "provide[] grounds for relief unless the exclusion or failure to produce prejudiced [the] defense," United States v. Nelson-Rodriguez, 319 F.3d 12, 35 (1st Cir. 2003), the defendants contend that this Court cannot evaluate the prejudicial effect of the failure to produce the materials given that the content of the redacted material is still unknown and thus that we must remand for the District Court to conduct a hearing.

The government responds that a claim of prejudice cannot lie because the defense declined the offer for a continuance that the District Court had given to them and thus that a remand for a hearing is not required.  See United States v. Arboleda, 929 F.2d 858, 863-64 (1st Cir. 1991); cf. United States v. Kifwa, 868 F.3d 55, 63 (1st Cir. 2017) ("Where, as here, a defendant spurns a continuance that would have cured the adverse effects of a delayed disclosure, a claim of prejudice will not lie.").  The defendants maintain, however, that we cannot determine whether a continuance would have cured the prejudice until the government produces the unredacted Threat Assessment or a Jencks determination is made as to that material.

It is true that Kifwa and the other authority the government relies on concern the failure by a defendant to seek a continuance after belatedly receiving the discoverable information.  See Kifwa, 868 F.3d at 63; United States v.

Sepulveda, 15 F.3d 1161, 1178 (1st Cir. 1993). Here, by contrast, the defense never received the redacted portion of the Threat Assessment that the defendants contend was potential Jencks material. Nor did the defense at any point obtain a ruling from the District Court that that material was not Jencks material.

But, these facts demonstrate only that we do not know whether the material was actually subject to production (and that its absence was therefore potentially prejudicial). These facts do not demonstrate that a continuance would not have cured the prejudice. The defendants, moreover, do not themselves offer a reason to conclude that a continuance would not have cured the prejudice, aside from the fact that there was no review of, or Jencks determination as to, the redacted portions of -- and, if such a document exists, an amended version of -- the Threat Assessment.

Indeed, the record contains nothing that shows that a continuance would not have allowed the determination about whether the material was Jencks material to be made. And, had that determination been made in the affirmative, the District Court had made clear to the parties that it would "permit a recall of [Agent Wood]," should it be "appropriate and fair to do [so]," if the information turned out to be Jencks material useful to the defense. See Arboleda, 929 F.2d at 864 (finding "failure to identify any prejudice" doomed Jencks claim because it "is not enough" that

defense counsel argued that cross-examination would have been "conducted 'differently'" had Jencks material been available at that time and because defense counsel "persisted in declining the trial court's invitations to recess or recall the witnesses for further questioning"); United States v. Pope, 574 F.2d 320, 326-27 (6th Cir. 1978) (concluding that the government's failure to timely furnish Jencks statements was "cured by the remedy [the District Court] provided in permitting the proofs to be reopened so that [the witness] could be further cross-examined on the basis of the omitted statement"). Thus, in these circumstances -- where the defense spurns a continuance that would have allowed the District Court to conduct an in camera review of the full document to determine whether it is Jencks material -- the defendants cannot demonstrate the prejudice that they must to succeed on a claim of a Jencks Act violation, which means no remand for a hearing is necessary. See United States v. Rosario-Peralta, 175 F.3d 48, 53 (1st Cir. 1999); Arboleda, 929 F.3d at 864 (noting that we have "treated with skepticism similar claims of prejudice when accompanied by a failure to attempt at trial to mitigate the perceived harm").

**V.**

Next up are two challenges that concern the admission of various statements by witnesses at trial. We conclude that neither one has merit.

## A.

Larios, Sandoval, and Guzman bring the first of these two challenges, in which they contend that the admission of cooperating witness CW-1's statements -- included in transcripts of conversations between the defendants and other ESLS members taken from recordings that CW-1 had made for the government -- violated the Confrontation Clause and thus requires that their convictions be vacated.[11] We find no merit to the contention.

### 1.

Beginning in 2014, CW-1 began to record some of the ESLS clique meetings at the garage in Everett. In 2015, the FBI set CW-1 up as a "gypsy cab driver" -- or an unlicensed cab driver -- and outfitted his vehicle with a secret audio-video recorder. Through this means, CW-1 recorded conversations with various MS-13 members who called for rides. Additionally, the FBI was able to intercept CW-1's phone calls. The transcripts of some of the recorded conversations from these sources -- translated into English -- were introduced into evidence, and some portions were read aloud to the jury during the trial.

---

[11] Larios has asserted this claim on appeal, and both Sandoval and Guzman purport to join Larios's challenge. And, although some of the particular aspects of this challenge -- such as the statements concerning the drug protection detail -- are specific to Larios, we still treat this claim as brought by all three defendants for ease of exposition.

Before trial, Larios filed a motion in limine to exclude CW-1's statements contained on the audio recordings, when offered by the government, so long as CW-1 was unavailable for cross-examination.[12]  The District Court subsequently denied the motion on the understanding that the statements would not be offered for their truth, given the government's representation to that effect. But, the District Court made clear that the issue would be revisited at trial "if it looks like there is something that is offered for its truth."

**2.**

We review preserved challenges to the District Court's evidentiary rulings for abuse of discretion, though in doing so "we consider de novo whether the strictures of the Confrontation Clause have been met."  United States v. Walter, 434 F.3d 30, 33 (1st Cir. 2006) (quoting United States v. Vega Molina, 407 F.3d 511, 522 (1st Cir. 2005)).  Where the appellant did not lodge a proper objection below, we review only for plain error.  United States v. Díaz, 670 F.3d 332, 344 (1st Cir. 2012).

---

[12] The motion in limine specifically identified portions of recordings from the January 8, 2016 clique meeting -- specifically those concerning finding housing for Joel Martinez -- and recordings from a December 8, 2014 drug protection detail.  Though this feature of the motion may have alerted the District Court to the statements Larios believed were in danger of being used for their truth, the motion in limine did not provide the context that would have enabled the District Court to determine the purpose for which the statements were proffered.

Larios's motion in limine was not on its own sufficient to preserve the objection.  See United States v. Noah, 130 F.3d 490, 496 (1st Cir. 1997) ("It is settled in this circuit that, when the district court tentatively denies a pretrial motion in limine, or temporizes on it, the party objecting to the preliminary in limine determination must renew his objection during the trial, and the failure to do so forfeits any objection."); United States v. Reda, 787 F.3d 625, 628 n.1 (1st Cir. 2015).  But, the defendants contend that they renewed this objection during the trial and thereby preserved it.  We are not persuaded.

The defendants first point to a "standing objection" that the District Court granted to "all the videos" on the third day of trial.  But, the grant of that standing objection was given in the course of the presentation of various surveillance videos collected from "personal cameras" from "several residences," which bear no clear relation to the statements at issue here.  The grant of that standing objection also followed a series of objections on relevance grounds.

The defendants separately point to an objection that was made concerning the speaker designations in the transcript and the need for authentication of the transcripts.[13]  But, this objection,

---

[13] The defendants had previously raised Confrontation Clause issues arising from Agent Wood conveying impressions from oral statements, which relied upon translations and speaker

- 51 -

too, made no reference to any Confrontation Clause concerns; it focused only on concerns related to speaker identification, the "accuracy of the translations," and <u>Petrozziello</u> issues.[14]

Nor do either of the two subsequent objections that the defendants also highlight have any apparent connection to this particular confrontation issue. One such objection concerned Wood's testimony and the basis of his knowledge. The other, after which the District Court "g[ave] a standing objection to defendants on the transcripts," was the "[s]ame objection" seemingly on the issue of the transcript authentication, speaker identification, and translation accuracy. At most, therefore, we review this claim for plain error, which means that we must find that the District Court committed "(1) an error (2) that is clear and obvious, (3) affecting the defendant's substantial rights, and (4) seriously impairing the integrity of judicial proceedings." <u>Reda</u>, 787 F.3d at 628.

---

identifications for which Agent Wood -- who did not speak Spanish -- did not have personal knowledge.

[14] The defendants do not contend that the issue of CW-1's statements being used for the truth came within the <u>Petrozziello</u> objection. Nor could they, given that the defendants maintained that CW-1 was <u>not</u> a coconspirator such that the admission of his testimony would depend on the court's <u>Petrozziello</u> finding. <u>See</u> <u>United States</u> v. <u>Petrozziello</u>, 548 F.2d 20, 23 (1st Cir. 1977) (holding that the out-of-court declaration of an alleged coconspirator is properly admitted only when "it is more likely than not that the declarant and the defendant" were coconspirators "and that the statement was made in furtherance of the conspiracy").

The defendants who join this challenge "fail[] to even attempt to explain how the plain error standard has been satisfied." United States v. Veloz, 948 F.3d 418, 429 (1st Cir. 2020) (quoting United States v. Severino-Pacheco, 911 F.3d 14, 20 (1st Cir. 2018)); see also United States v. Pabon, 819 F.3d 26, 33 (1st Cir. 2016) ("[Appellant] has waived these challenges because he has not even attempted to meet his four-part burden for forfeited claims."). Moreover, even if we looked past the appellate waiver, we would find no plain error.

The parties agree that the statements at issue were testimonial. The key issue, therefore, is whether they were "admitted for purposes other than establishing the truth of the matter asserted." United States v. Maher, 454 F.3d 13, 19-20 (1st Cir. 2006).

Many of the statements by CW-1 that the defendants challenge were made during the January 8, 2016 clique meeting that, the evidence supportably shows, ended with Joel Martinez's jump-in. For example, the transcripts entered into evidence show that, during that meeting, in a conversation about the murder of Irvin de Paz and who would receive credit for it (and, at the same time, who would be implicated for it), CW-1 characterized Joel Martinez as being "on observation" by another MS-13 clique at the time he murdered Irvin de Paz. The transcripts further show that in that

conversation CW-1 expressed the view that the ESLS clique had to think about finding housing for Joel Martinez, though this was not the first time this had been suggested in the recorded conversation. And, in a discussion about the "hits" that Joel Martinez had done, the transcripts show that CW-1 added that "[he] did another one with [Sanchez]" and then characterized that hit as being against rival gang members rather than civilians.

The defendants contend that these statements were offered to establish that these attacks happened, that they were connected to MS-13, and that the clique was finding housing for Joel Martinez because he committed the murder. Similarly, they point to CW-1's statements identifying the victims in the murder of Javier Ortiz as rival gang members. And, the defendants contend that CW-1's statements telling Joel Martinez that he should ask to be an ESLS homeboy provided substantive evidence showing that criminal activity was acceptable to MS-13 members. They also contend that CW-1's statements on the transcripts connected to a December 8, 2014 drug protection detail for which CW-1 solicited Larios's help were offered for their truth because it was CW-1 who "proposed the plan" and because CW-1's statements "related to the commission of that criminal activity."

The defendants are right that we have been careful to reject "overbroad" applications of the "context" exception to the prohibition against the admission of hearsay. E.g., United States

v. Cabrera-Rivera, 583 F.3d 26, 33-34 (1st Cir. 2009) (quoting Maher, 454 F.3d at 22-23). The "context" justifications that were rejected in those cases, however, are distinguishable.

In both Cabrera-Rivera and Maher, the non-hearsay rationale for the statements was that they "put the investigation into context" -- that is, they helped explain why the investigation proceeded as it did. Cabrera-Rivera, 583 F.3d at 33; see Maher, 454 F.3d at 22. The admission of the challenged statements here, in contrast, can fairly be characterized as putting the conversation into context -- that is, putting the defendants' statements into the full context of the conversation so that their inculpatory nature could be properly understood. See Walter, 434 F.3d at 34 ("The other parts of the discussion 'were properly admitted as reciprocal and integrated utterance(s) to put [the defendant's] statements into perspective and make them intelligible to the jury and recognizable as admissions.'" (alteration in original) (quoting United States v. McDowell, 918 F.2d 1004, 1007 (1st Cir. 1990))).

The defendants who join this challenge do rightly assert that some of CW-1's statements that they challenge as improperly admitted identified various attacks -- which the government then characterized as racketeering activity -- and linked them to MS-13. For example, it was CW-1 who, in a conversation at the January 8, 2016 clique meeting about the hits that Joel Martinez had

participated in, added that "he did another one with [Sanchez]." The defendants thus contend that these statements were offered for the truth of the matter that these attacks occurred and were committed by other MS-13 associates in furtherance of the conspiracy.

But, as the government points out, such statements were admissible not only as "reciprocal and integrated utterances" but also to demonstrate the clique's motivations for jumping Joel Martinez into the clique and the clique members' reactions to reports of violence, rather than for the truth of what was asserted in CW-1's statements -- for example, that Joel Martinez actually did commit that hit. And, notably, there was other evidence presented about the fact of the commission of these attacks,[15] while the government's closing argument makes clear that it was using the transcripts to illustrate how the clique responded to the commission of these attacks. Even beyond those reasons, we also note that the defendants did not seek a limiting instruction when the transcripts were presented. See id. at 35 (holding that because the defendant "never asked for such a limiting

_____

[15] The defendants contend that there was "no factual basis for the murder [of Irvin de Paz] and connecting it to MS-13 except for CW-1 reporting it in the transcript." But, Sergeant Richard Daley of the Boston Police Homicide Unit and FBI Special Agent Jeffrey Wood testified about the murder and the identification of Joel Martinez as the perpetrator, and there was plenty of other evidence connecting Joel Martinez to MS-13.

instruction . . . he is not entitled to argue here that the district court's failure to provide [one] constitutes reversible error"). We thus conclude that the admission of these statements is, if error at all, not the sort of "'indisputable' error [that] warrants correction on plain error review," United States v. Ackerly, 981 F.3d 70, 76 (1st Cir. 2020) (quoting United States v. Jones, 748 F.3d 64, 70 (1st Cir. 2014)).

B.

Larios also challenges the admission of his own post-arrest statement. But, this challenge fails as well.

At trial, Hernandez Miguel testified about certain statements that Larios made to him while they were detained together after being arrested in January 2016. The conversation concerned Larios's prior arrest, in January 2015, on Massachusetts firearms charges. Larios reportedly told Hernandez Miguel that after his 2015 arrest he was "certain it was [CW-1] who had snitched on him," so he formed a plan with Martinez to kill CW-1 and asked Sandoval for a "green light" to kill him.

Larios does not and cannot argue that the statement was inadmissible when offered against him. See Fed. R. Evid. 801(d)(2)(A) (statements by party opponents are "not hearsay"). Instead, he argues that the statements were inadmissible in the joint trial because their admission violated Sandoval's and

Martinez's <u>Bruton</u> rights.[16]  See <u>Bruton</u> v. <u>United States</u>, 391 U.S. 123, 137 (1968) (holding that a defendant's Confrontation Clause rights are violated when a non-testifying codefendant's confession implicating the defendant in the crime is introduced at their joint trial).  But, this claim necessarily fails because "<u>Bruton</u> is inapplicable [where] the statement in question was [the defendant's] own, not that of a codefendant."  <u>United States</u> v. <u>Rivera-Rodríguez</u>, 617 F.3d 581, 594 (1st Cir. 2010); cf. <u>United States</u> v. <u>Sabatino</u>, 943 F.2d 94, 96 n.1 (1st Cir. 1991) ("Sixth Amendment rights . . . are personal in nature and cannot be asserted vicariously . . . .").[17]

**VI.**

Our next focus is on a pair of challenges that concern purported misstatements of the evidence in the government's closing argument.  Here, too, the challenges provide no basis for overturning the convictions of any of the defendants.

**A.**

The first of these challenges is Sandoval, Guzman, and Larios's claim that a mistrial was warranted based on the

---

[16] Larios makes clear that the claimed constitutional infirmity is not that he or any other defendant was unable to confront Hernandez Miguel, who was available for cross-examination; instead, it is that Sandoval and Martinez were unable to confront Larios himself.

[17] Neither Sandoval nor Martinez has joined this claim.

- 58 -

government's inaccurate closing-argument comment that Sandoval had ordered his clique to "go kill chavalas." This challenge concerns a statement that the government made during rebuttal in response to Sandoval's closing argument that there was no evidence that he had advance knowledge of the racketeering acts alleged or had agreed that anything should happen to victims like Javier Ortiz and Irvin de Paz. The statement was:

> [Sandoval] doesn't say to his clique, I want you to go kill Irvin de Paz, I want you to go kill Javier Ortiz, I want you to kill Saul Rivera, I want you to kill Minor Ochoa, right, he says go kill chavalas, right, so this advanced warning argument is foolish.

Sandoval moved for a mistrial on the ground that there was no evidence that he said, "go kill chavalas." The government responded that the statement was paraphrasing what Sandoval had said and constituted fair argument based on Sandoval's position in the clique and the statements that the evidence supportably shows that he had made. The District Court denied Sandoval's motion.

We review the denial of a request for a mistrial for abuse of discretion, United States v. Gentles, 619 F.3d 75, 81 (1st Cir. 2010), and a preserved challenge to the propriety of a prosecutor's arguments de novo, Veloz, 948 F.3d at 435. We find no error by the District Court in denying the motion for the mistrial based on the prosecutor's statement in the closing argument.

The prosecutor's statement in the closing argument, when considered in context, did not suggest that Sandoval had said the precise words "go kill chavalas." Moreover, the record did contain evidence supportably showing that Sandoval said to Hernandez Miguel, in explaining to him what it means to be a member of MS-13 in connection with his possibly becoming a member of its ESLS clique, that "when one is jumped into MS-13, one is aware that one is jumped in to kill or to look for chavalas." We thus conclude that the statement by the government in its rebuttal to Sandoval's closing argument offered a reasonable interpretation of existing evidence. We note, too, that the District Court instructed the jury in terms that apprised it of the need to distinguish between argument and evidence.

**B.**

Guzman also takes aim at what he contends is a misstatement that the government made at the end of its closing argument. In summarizing the involvement of each defendant, the prosecutor stated:

> [Guzman] is along with [Hernandez Miguel] when he breaks that beer bottle over that man's head and leaves him gasping for air in the street in East Boston. He collects the money that enables MS-13 to continue to thrive, he beats [Sanchez] for violating clique rules, and he's actually the one that counts [Joel Martinez] in to the Eastside clique and welcomes him to La Mara.

(emphasis added).

- 60 -

The parties' transcripts both indicate that it was Guzman who counted to thirteen during Joel Martinez's jump-in. There was a dispute over who said words "Welcome to the Mara, buddy," immediately after the jump-in. But, no party attributed this statement to Guzman.[18] The government therefore concedes that the statement quoted above contained a misstatement.

In light of that concession, we must determine "whether the offending conduct so poisoned the well that the trial's outcome was likely affected." United States v. Morales-Cartagena, 987 F.2d 849, 854 (1st Cir. 1993) (quoting United States v. Mejia-Lozano, 829 F.2d 268, 274 (1st Cir. 1987)). In doing so, "we must assess the prosecutor's statements 'within the context of the case as a whole,'" United States v. Madsen, 809 F.3d 712, 717 (1st Cir. 2016) (quoting United States v. Pires, 642 F.3d 1, 14 (1st Cir. 2011)), "consider[ing] 'the frequency and deliberateness of the prosecutor's comments, the strength and clarity of the trial

_____

[18] Speaker identifications had been an issue throughout the trial. During the final pretrial conference, Larios's counsel cited the fact that the "Welcome to the Mara" statement had been attributed to Guzman at his detention proceeding but then was identified with a different speaker in the transcripts used at trial as an example of the difficulties of speaker identification in this case involving many group meetings and many different speakers. And, during Sandoval's cross-examination of Agent Wood, Wood indicated that he was told that it was Guzman who spoke the words "Welcome to the Mara." Thus, Guzman claims that although he did not contemporaneously object to the argument that Guzman was the one who "welcome[d]" Joel Martinez, the District Court "was certainly alerted to the issue."

judge's instructions, and the strength of the government's case against the defendant,'" id. (quoting Morales-Cartagena, 987 F.2d at 854). Moreover, because Guzman did not raise this objection below, our review is only for plain error. We find none.

There is no assertion that the misstatement was deliberate. In fact, the ongoing confusion about speaker identification suggests that it was not.

The misstatement was also brief and isolated. That fact is not in and of itself necessarily dispositive, see United States v. Santana-Camacho, 833 F.2d 371, 373-34 (1st Cir. 1987); cf. United States v. Azubike, 504 F.3d 30, 38-41 (1st Cir. 2007) (reviewing preserved challenge), as the remark did go to an issue that the government had made central to the case. But, in this case, this one isolated remark did not "strongly fortif[y] the government's theory." Santana-Camacho, 833 F.2d at 374.

In an attempt to show otherwise, Guzman's counsel argues that other evidence in the record indicates that Guzman did not fully embrace jumping Joel Martinez into the clique. But, the jury also was presented with evidence that Guzman attended the jump-in, actively participated in the jump-in, including counting to thirteen, and advocated for helping Joel Martinez find a place to stay to hide out from the police.

In addition, the District Court gave clear and repeated instructions that the statements and arguments of counsel were not

evidence and that "[i]f the facts as you remember them from the evidence differ from the way the lawyers have stated them, your memory of the facts should control." See Morales-Cartagena, 987 F.3d at 855 (finding such an instruction to decrease the risk of juror confusion resulting from government's misstatement of facts). And, while such an instruction may not be sufficient to mitigate the prejudicial effects of a misstatement in all cases, see, e.g., Azubike, 504 F.3d at 41-42, we note that in this case the government's closing argument also repeatedly encouraged the jury to reread the transcript of the January 8, 2016 meeting and jump-in to "really understand what it is that th[e] clique is doing when they jump in and celebrate [Joel Martinez] as a new member of the gang." That is significant because the transcripts clearly did not attribute the "Welcome to the Mara" comment to Guzman, while at the same time they identified Guzman as the one counting down. Cf. Pires, 642 F.3d at 15 (noting that the jury took a recording that included the accurate statement that the government had misquoted during its argument into the jury room). Thus, considering the record as a whole, we find no real risk that the misstatement "unfairly prejudiced the jury's deliberations." Santana-Camacho, 833 F.2d at 375 (quoting United States v. Young, 470 U.S. 1, 19 (1985)).

**VII.**

We next turn to the purported instructional errors that Sandoval, Guzman, and Larios raise. First, they contend that the District Court improperly instructed the jury regarding the intent required for RICO conspiracy. They also claim that the District Court's refusal to give an entrapment instruction constituted reversible error. And, finally, they assign error to the District Court's denial of Larios's request for a missing witness instruction.

**A.**

At trial, the District Court instructed the jury, in relevant part, as follows:

> Again, a conspiracy is an agreement to commit a crime. The agreement may be spoken or unspoken. It does not have to be a formal agreement or a plan in which everyone involved sat down together and worked out all the details. The government, however, must prove beyond a reasonable doubt that those who were involved intended to agree and shared a general understanding about the crime.

The defendants contend that this instruction left the jury with an overly broad understanding of the requisite intent for RICO conspiracy. Specifically, they contend that the District Court erred in refusing Guzman's proposed instruction, which requested that "general" be replaced with "specific," such that the instructions would have provided that the government "must prove

beyond a reasonable doubt that those who were involved shared a specific understanding about the crime."

At the jury charge conference on February 16, 2018, Guzman noted in response to the District Court's draft of the instruction that it gave that in his proposed jury instructions he "had asked for the word 'specific' to be included and to delete 'general.'" The District Court responded that the charge it planned to give was "standard language" and that it may be confusing to replace "general" with "specific," but indicated that it was willing to reconsider the issue if Guzman had a case indicating that the requested language was accurate. Guzman thereafter filed a written request for a "specific intent" instruction, asking that "the word 'general' on page 28 of the Court's proposed jury instruction[s] . . . be changed to the word 'specific.'"

The District Court ultimately concluded that it would not give the instruction that Guzman proposed. It explained that the "general understanding" language that it planned to use in the instruction it intended to give was "standard language" and that it did not believe that Guzman's proposed instruction was correct. The District Court instructed the jury with the "general understanding" language quoted above. After the jury instructions were given, Guzman noted that he "continue[d] to object to the word 'general' . . . , and it should be 'specific.'"

A district court's "refusal to give a particular instruction constitutes reversible error only if the requested instruction was (1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case." United States v. McGill, 953 F.2d 10, 13 (1st Cir. 1992). Here, the requested "specific intent" instruction would have charged the jury that the "government . . . must prove beyond a reasonable doubt that those who were involved intended to agree and shared a specific understanding about the crime."

In rejecting the requested substitution of "specific" for "general," the District Court correctly explained that "[t]he agreement has to be the specific agreement, in this case, to commit racketeering in such-and-such a way, but you don't have to agree to every detail of the agreement or every detail of how the crimes are going to be committed." See Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1562 (1st Cir. 1994) ("To prove a violation of § 1962(d), it is enough to prove that a defendant agreed with one or more others that two predicate offenses be committed. . . . It is not necessary, however, to find that each defendant knew all the details or the full extent of the conspiracy . . . ."). Thus, we agree with the District Court that instructing the jury that the defendants must have "shared a specific understanding about the crime" may have at the very least been misleading in suggesting

not only that the defendants needed to intend that some member of the conspiracy would commit two of a certain type of predicate act but also that they understood and agreed to the particular manner in which those predicate acts would be committed. And, "the law is settled that a trial court may appropriately refuse to give a proffered jury instruction that is incorrect, misleading, or incomplete in some material respect." United States v. DeStefano, 59 F.3d 1, 4 (1st Cir. 1995); see also United States v. David, 940 F.2d 722, 738 (1st Cir. 1991) ("[T]he lower court acted within its discretion in refusing to give an instruction which, if not flatly erroneous, at least ran a substantial risk of misleading the jury.").

At points, the defendants also appear to argue on appeal that the instructions that were given were themselves problematic, because they "failed to make clear the requirement that each defendant share the specific understanding or intent that a coconspirator would commit two or more of the predicate acts or type of acts charged." But, insofar as such an argument is properly before us, we reject it. Considered as a whole, the instructions "adequately illuminate[d] the law applicable" to the issue. DeStefano, 59 F.3d at 3; see Leoner-Aguirre, 939 F.3d at 317 n.7 (rejecting argument that district court erred in referring to "types of racketeering in its instruction, rather than precise acts" (citing United States v. Applins, 637 F.3d 59, 80-82 (2d

- 67 -

Cir. 2011))).  In fact, they did not even "var[y] in a material way," United States v. Barnes, 251 F.3d 251, 260 (1st Cir. 2001) (emphasis omitted), from the instruction Guzman requested.[19]

To that very point, the District Court instructed the jury that "the government must prove that the defendants agreed that one or more members of the enterprise would commit crimes that qualify as racketeering acts by law and that are specified in the indictment."  The instructions specified that the jury "must unanimously agree as to each defendant individually on which type or types of racketeering activity that defendant agreed the enterprise would conduct."  And, in response to a note from the jury, the District Court explained that while "[t]he defendants don't have to have personally committed any racketeering acts" or agree that they would do so, "the agreement has to include an agreement that a pattern of racketeering activity would occur, and they have to agree that a particular type of racketeering activity would occur, and you have to unanimously agree on the particular type of racketeering activity."

---

[19] Although we reject the defendants' claim of instructional error on this score here, there is not a "one size fits all" approach to such instructions.  We examine the "context" of "the court's instructions as a whole" on a case-by-case basis.  Barnes, 251 F.3d at 259-60.  We note, though, that in consequence we do not endorse the government's contention that we must uphold the instruction here just because we upheld an instruction containing similar "general understanding" language in Barnes.

- 68 -

**B.**

Guzman, Sandoval, and Larios also argue that the District Court's failure to give a requested jury instruction on entrapment was reversible error. Entrapment is an affirmative defense, and "an accused is entitled to an instruction on his theory of defense so long as the theory is a valid one and there is evidence in the record to support it." United States v. Rodriguez, 858 F.2d 809, 812 (1st Cir. 1988). We conclude that there was not sufficient evidence of entrapment here to support such an instruction, however, and so there was no error.

**1.**

During the trial, Guzman filed a written request for a jury instruction on entrapment. At the charge conference, Guzman argued that such an instruction was warranted given the evidence that the government's cooperating witness "basically brought racketeering acts to the Eastside clique," which could enable the jury to conclude that "if [Guzman] did, in fact, enter into this conspiracy, it was because he was entrapped by the government's agent." The District Court, after carefully considering the request and recognizing that the "failure to give[] an entrapment [instruction] if there is sufficient evidence for a jury to find entrapment is reversible error," ultimately declined to give the instruction.

Larios preserved this issue by objecting, on behalf of all defendants, to the failure to give the entrapment instruction. Therefore, we review the District Court's refusal to give the entrapment instruction de novo, "examin[ing] the evidence in the light most favorable to the accused so as to determine whether the record supports an entrapment theory." United States v. Vasco, 564 F.3d 12, 18 (1st Cir. 2009) (quoting United States v. Shinderman, 515 F.3d 5, 13 (1st Cir. 2008)).

**2.**

For a defendant "to be entitled to an instruction on entrapment, the record must show 'some hard evidence' of both government inducement" of the criminal conduct "and the defendant's lack of predisposition" to engage in the criminal conduct. United States v. González-Pérez, 778 F.3d 3, 11 (1st Cir. 2015) (quoting Shinderman, 515 F.3d at 14). Here, the evidence is insufficient with respect to the inducement showing, which "requires not only giving the defendant the opportunity to commit the crime but also a 'plus' factor of government overreaching." Id. (quoting United States v. Guevara, 706 F.3d 38, 46 (1st Cir. 2013)); see also United States v. Dávila-Nieves, 670 F.3d 1, 10 (1st Cir. 2012) (explaining that "[t]ypical plus factors are 'excessive pressure, . . . taking advantage of an alternative, non-criminal type of motive,' . . . intimidation, threats, or 'dogged insistence'" (first quoting United States v.

Young, 78 F.3d 758, 761 (1st Cir. 1996); and then quoting Vasco, 564 F.3d at 18)).

The defendants assert that the government used its cooperating witness, CW-1, to "specifically target" the defendants through "excessive pressure" and "improper tactics."[20] These tactics, according to the defendants, included delaying arrests to bolster evidence; using "an ex-convict and deportee" as a cooperating witness; allowing the cooperating witness to "plot with . . . MS-13 leaders to 'green light' Sandoval and Guzman" because they were not "out on the streets committing acts of violence"; assisting the cooperating witness in arranging drug protection details; continuing to employ the cooperating witness even after he had committed "serious violent crimes"; directing the cooperating witness to encourage Sandoval to invite Martinez to join the ESLS clique; and having the cooperating witness

---

[20] Because CW-1 is a government agent for this purpose, the doctrine of "derivate entrapment" is inapposite. Compare United States v. Luisi, 482 F.3d 43, 53 (1st Cir. 2007) ("It is beyond dispute that an individual . . . hired by the government as an informant[] is a 'government agent' for entrapment purposes."), and Sherman v. United States, 356 U.S. 369, 374-75 (1958) (holding that unpaid informant was still a government agent for entrapment purposes when government was not aware of informant's methods), with Luisi, 482 F.3d at 53 (explaining that "derivate entrapment" occurs when "a government agent 'uses [an] unsuspecting middleman as a means of passing on an inducement' to the defendant" (quoting 2 Wayne R LaFave, Substantive Criminal Law § 9.8(a) (2d ed. 2003))).

- 71 -

manipulate the timing of Martinez's jump-in such that the defendants would be "tied to Martinez's violent acts."

The defendants develop no argument explaining, however, how these actions constituted "excessive pressure," and our law on government inducement does not support categorizing them as such. The actions do demonstrate that the government, through its agent, "created the opportunity for [the defendants] to become criminally involved." United States v. Pratt, 913 F.2d 982, 989 (1st Cir. 1990). Those actions do not, however, "make the government's involvement rise to the level of entrapment." Id.; see also United States v. Teleguz, 492 F.3d 80, 84-85 (1st Cir. 2007) (recognizing that "sting operations by their nature often involve government manipulation, solicitation, and, at times, deceit" but noting that they "ordinarily do not involve improper inducement").

Looking at the evidence in the light most favorable to the defendants, no reasonable juror could conclude that the government improperly induced the crime. We therefore "need not dwell on the evidence of predisposition." González-Pérez, 778 F.3d at 13 (citing United States v. Ramos-Paulino, 488 F.3d 459, 462 n.1 (1st Cir. 2007)).[21]

---

[21] We do note that, although the required showing as to predisposition is not in this posture a particularly burdensome one, see Luisi, 482 F.3d at 58, Sandoval and Larios have joined this claim -- which Guzman raises on appeal -- without developing any argument as to predisposition, which is necessarily a

## C.

That leaves the claim that these same three defendants press on appeal concerning the District Court's failure to give a "missing witness" instruction concerning CW-1. We again find no error.

## 1.

The requested instruction would have directed the jury as follows:

> If it is particularly within the power of the government to produce a witness who could give material testimony, or if a witness, because of [his] relationship to the government, would normally be expected to support the government's version of events, the failure to call that witness may justify an inference that [his] testimony would in this instance be unfavorable to the government.

We review the District Court's refusal to give the instruction for abuse of discretion. United States v. DeLuca, 137 F.3d 24, 38 (1st Cir. 1998).

A threshold requirement for a missing witness instruction is that the uncalled witness not be "equally available to both parties." United States v. Spinosa, 982 F.2d 620, 632 (1st Cir. 1992). Even if the uncalled witness may be physically available to the defense, a missing witness instruction may be appropriate when the witness was so "'favorably disposed' to

---

defendant-specific inquiry, and have therefore waived the issue. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

testify for the government by virtue of their status or relationship with the parties," DeLuca, 137 F.3d at 38 (quoting United States v. Welch, 15 F.3d 1202, 1214 (1st Cir. 1993)), that the witness "is considered to be legally unavailable," Spinosa, 982 F.2d at 632.

Before trial, the defendants jointly moved to compel the disclosure of CW-1's location to defense counsel after learning that CW-1 had been terminated from the witness protection program. The defendants' motion sought CW-1's location "so that defense counsel [could] subpoena him to appear as a witness at trial." The government declined to provide CW-1's address given the "serious, ongoing, and obvious security threat to CW-1 and CW-1's family" but indicated that "CW-1 will be available" should the defendants wish to call him as a witness at trial. The government reaffirmed at the final pretrial conference that it would produce CW-1 for trial if the defense so requested.

At that pretrial conference, the defendants argued that production for trial alone would be insufficient and that it was important to be able to speak to the witness before trial. The District Court indicated that it would consider the defendants' request to receive independent access to interview CW-1 before the trial if the defense filed a motion outlining the Court's authority to do so; otherwise, it would "assume that the government would deal with [the] problem [of] the defendant[s'] inability to locate

CW-1 or subpoena him by producing him upon reasonable request to testify at the trial or to be available for testimony at the trial," an approach it found "sufficient" given the safety concerns.

There is no indication that the defense filed such a motion or pursued the issue of interviewing CW-1 pretrial further. The defense did, however, continue to dispute throughout the trial that there was an "equal opportunity" to call CW-1 given that there would be no opportunity to talk to the witness before calling him to the stand.

Larios included a "missing witness" instruction in his proposed jury instructions. He later renewed his request for a "missing witness" instruction, explaining that the government's offer to produce CW-1 was "hollow" -- as it required the defense to "call a witness that [it] cannot interview or contact prior to trial" -- and arguing that a missing witness instruction was proper given that CW-1 was "favorably disposed" to testify on behalf of the government.

The District Court addressed the request for a missing witness instruction on the last day of trial. The government argued that "[it] has always indicated [its] willingness to make [CW-1] available," and though it did not "give [the defense] the address, as the Court said [it] did not have to, to let an investigator walk up to his front door and knock," it would have

made CW-1 available so that the defense could "speak with him directly" had the defendants so requested. Larios's counsel responded that "it was never made known to [the defense] that [CW-1] would be available to be interviewed. In fact, it was made known to [the defense] that [CW-1] would not be available for an interview, just physically to be able to be called as a witness at trial." The District Court noted the unusual nature of the situation given that CW-1 had been terminated from the witness protection program but determined that it would not give the "missing witness" instruction.

## 2.

The defendants seem to acknowledge that CW-1 was not physically unavailable given that the government was willing to produce him for trial. But, this does not end our inquiry, because the defendants contend that CW-1 was legally unavailable by virtue of his relationship with the government and the fact that the defense was unable to speak to him before trial.

We find that the District Court did not abuse its discretion in denying the instruction in these circumstances. The defense never made a formal request in the District Court for permission to interview CW-1, even though at the pretrial conference the District Court had invited the defense to file a motion to that effect. Thus, we find that the defendants cannot claim that CW-1 was "unavailable" on the basis of the inability to

speak to him before calling him to the stand, given that the defendants never requested that the government produce CW-1 for an interview after it refused to disclose his location.

The defendants also argue that a missing witness instruction was warranted on another basis. We have recognized that the government's failure to call a witness who is physically available to the defense and could be subpoenaed by them could be a basis for the defendants to receive a missing witness instruction in limited circumstances. We have explained that if such a witness is "clearly favorably disposed" to the government, the witness may be treated as not legally "available" to criminal defendants such that the defendants would be entitled to the missing witness instruction even though they would have had the means to call that witness. Spinosa, 982 F.2d at 633; DeLuca, 137 F.3d at 38. The notion is that the instruction is appropriate to call attention to the possible defendant-friendly inference that arises from the government's failure to call that witness. See United States v. Ariza-Ibarra, 651 F.2d 2, 16 (1st Cir. 1981).

There is no such showing here, however, that would convince us that the District Court abused its discretion in denying the instruction on this basis. The fact that CW-1 was a government informant for an ongoing period is not independently sufficient to establish favorable disposition for an equally available witness. See DeLuca, 137 F.3d at 38 (noting that paid

government informants' "cooperation . . . during the criminal investigation did not necessarily satisfy appellants' burden of proof" to establish favorable disposition).

This is not to say that any greater showing would be required of a defendant who was denied access to the uncalled witness when such access could have enabled the defendant to demonstrate that the witness was favorably disposed toward the government.  Cf. Ariza-Ibarra, 651 F.2d at 17 n.1 (Bownes, J., dissenting) (noting that the majority "fault[s] the defense for failing to show how [an informant's] testimony would have been helpful to defendants" but finding it unclear "how the defense could have made such a showing when they were deprived of the opportunity to interview the informant").  In this case, however, our finding regarding the defendants' failure to pursue this access makes an argument along those lines by these defendants unavailing.

We note, too, that the defense was permitted to argue that the jury should draw a negative inference from CW-1's absence at trial.  That the defendants had that opportunity "significantly undercut[s]" their "claim that the denial of a 'missing witness' instruction was detrimental to the defense."  United States v. Martinez, 922 F.2d 914, 925 (1st Cir. 1991) (citing Ariza-Ibarra, 651 F.2d at 16 n.22); accord United States v. Perez, 299 F.3d 1, 5 (1st Cir. 2002).

**VIII.**

Finally, all four defendants bring challenges to their sentences.  We take these challenges in turn, starting with the ones that Sandoval brings.

**A.**

Sandoval first takes aim at the procedural reasonableness of his sentence.  Specifically, he contends that the District Court improperly attributed certain activity to him as "relevant conduct" under the applicable United States Sentencing Guidelines ("Guidelines").

**1.**

Under the Guidelines, the base offense level for a RICO conspiracy conviction is either 19 or, if greater, "the offense level applicable to the underlying racketeering activity." U.S.S.G. § 2E1.1(a)(1)-(2).[22]  We have understood "underlying racketeering activity" in this context to mean "any act, whether or not charged against [the] defendant personally, that qualifies as a RICO predicate act under 18 U.S.C. § 1961(1) and is otherwise relevant conduct under [U.S.S.G.] § 1B1.3."  United States v. Carrozza, 4 F.3d 70, 77 (1st Cir. 1993) (footnote omitted).

---

[22] We have interpreted this language in U.S.S.G. § 2E1.1(a) as a "cross reference," which refers in the Guidelines context to an instruction to apply another offense guideline.  United States v. Carrozza, 4 F.3d 70, 75 (1st Cir. 1993); see also U.S.S.G. § 1B1.5.

"[R]elevant conduct in a RICO case" for purposes of § 1B1.3 of the Guidelines "includes all conduct reasonably foreseeable to the particular defendant in furtherance of the RICO enterprise to which he belongs." Id. at 74. The District Court must find such relevant conduct by a preponderance of the evidence. United States v. Marino, 277 F.3d 11, 37 (1st Cir. 2002). Any such conduct becomes a "cross reference" that may be used to set the offense level. Carrozza, 4 F.3d at 75.

We review the District Court's interpretation and application of this guideline de novo. See United States v. Flores-Machicote, 706 F.3d 16, 20 (1st Cir. 2013). But, when it comes to the District Court's factual findings pursuant to this Guidelines regime -- such as which activities of the conspiracy were reasonably foreseeable to the defendant -- we review only for clear error. See id.; Marino, 277 F.3d at 38.

**2.**

Sandoval's revised Presentence Investigation Report ("PSR") concluded that Sandoval was accountable for three separate offenses that constituted "underlying racketeering activity": the attempted murder of December 27, 2015; the attempted murder of January 1, 2016; and being an accessory after the fact to the September 20, 2015 murder of Irvin de Paz. Each of these offenses -- or cross-references -- was treated as a separate group and,

when combined, these groups resulted in a combined adjusted offense level of 40.  See U.S.S.G. §§ 1B1.3(a), 3D1.4.

The PSR included a four-level adjustment for Sandoval's role as an "organizer or leader" of criminal activity.  See U.S.S.G. § 3B1.1(a).  The PSR then reduced the resulting total offense level ("TOL") of 44 to 43 pursuant to U.S.S.G. ch. 5, pt. A, cmt. n.2.  The PSR also determined that Sandoval's criminal history category ("CHC") was I.

The TOL of 43 and CHC of I yielded a Guidelines sentencing range ("GSR") of life imprisonment.  See U.S.S.G. ch. 5, pt. A (sentencing table).  But, because the statutory maximum was 20 years, see 18 U.S.C. § 1963(a),[23] the Guidelines sentence was also 20 years, or 240 months, see U.S.S.G. § 5G1.1(a).

Sandoval did not object below to the interpretation of the Guidelines that led to this determination in the PSR.  He did, however, contend that the government had not met its burden to show that the attempted-murder offenses treated as "relevant conduct" in the PSR were reasonably foreseeable to Sandoval and within the scope of his own agreement -- and, moreover, that the government failed to offer sufficient reliable evidence to

_____

[23] 18 U.S.C. § 1963(a) provides that the statutory maximum for a conviction under 18 U.S.C. § 1962 is "20 years (or life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment)."  The PSR used a 20-year statutory maximum as to Sandoval and the government did not argue that a higher statutory maximum should apply.

establish that Joel Martinez committed the acts or that the acts described constituted attempted murder at all. Sandoval also objected to the application of the accessory-after-the-fact cross-reference on multiple grounds -- including the fact that accessory after the fact was not a charged RICO predicate or, he argued, even a chargeable RICO predicate at all -- and contended that, should the District Court nevertheless apply a cross-reference for this activity, it should be limited to harboring, which carries a lower base offense level. See U.S.S.G. § 2X3.1(a)(3)(B).

Sandoval's sentencing hearing was held on October 9, 2018. After hearing the parties' arguments, the District Court found that the PSR correctly calculated the Guidelines offense levels and properly accounted for both the two attempted murders and the accessory-after-the-fact cross-reference.

In so concluding, the District Court made an individualized finding regarding the relevant conduct determination. It found that the two attacks were attempted murders and that first-degree murder was the appropriate cross-reference for these attempts. It then also found that they were reasonably foreseeable to Sandoval. Moreover, as to the accessory-after-the-fact cross-reference, the District Court found both that it was a racketeering act and that, by a preponderance of the evidence, Sandoval's actions went beyond mere harboring.

**3.**

On appeal, Sandoval reasserts his argument below that the government failed to prove, even by a preponderance of the evidence, that either attempted murder was reasonably foreseeable to him.[24] He points to the lack of any evidence presented at trial that he knew about either of these attacks in advance, much less ordered or authorized those attacks. He also contends that there is not sufficient evidence to support the general conclusion that any crime committed by Joel Martinez was foreseeable to Sandoval.

Whether the conduct was reasonably foreseeable to Sandoval is a fact-bound determination that we review for clear error. See Marino, 277 F.3d at 38; United States v. LaCroix, 28 F.3d 223, 226, 230-31 (1st Cir. 1994); United States v. Rodríguez, 731 F.3d 20, 28 (1st Cir 2013).[25] We find none.

The District Court supportably found that the evidence showed by a preponderance that based on Sandoval's conversations with Joel Martinez about joining ESLS, "[Joel Martinez] would view himself as being somewhat in a probationary lifestyle" requiring that he "prove that he was worthy by committing attacks," which

---

[24] Sandoval does not challenge the related determination that the acts were attempted murders by a preponderance of the evidence.

[25] Sandoval does not contend that the District Court failed to conduct an individualized analysis as to foreseeability. Nor could he, given that the record makes clear that the District Court made the requisite individualized assessment.

"indeed . . . followed [in] short order."  And, the District Court noted that the conclusion that it was foreseeable to Sandoval that such attacks would happen -- and that they would rise to the level of attempted murder -- was reinforced by Sandoval's statements at the January 8, 2016 clique meeting.  The District Court interpreted these statements as effectively stating that the attempted murders bolstered the clique's reputation and that the clique needed a "new generation."  Taken against the background of an organization supportably shown by a preponderance to have had a purpose to kill rivals, in which young people are promoted by attacking or killing them, the District Court supportably found it "reasonably foreseeable to [Sandoval] . . . that younger members would kill or attempt to kill to impress the leadership, to gain respect for themselves and to become members."

Sandoval contends that the conversation with Joel Martinez before the attempted murders at issue here contained no implication that Joel Martinez needed to do anything else to prove himself -- Sandoval argues that, to the contrary, he indicated that a discussion with the clique members was all that was needed.  And, Sandoval argues, the government failed to offer any evidence that he ordered Joel Martinez to commit any acts of violence or instructed anyone else to report back on Joel Martinez's activities.

But, the District Court's "conclusions were properly rooted in the evidence and its inferences founded in logical reasoning." United States v. Hernández, 218 F.3d 58, 71 (1st Cir. 2000). Its conclusion that the attempted murders were reasonably foreseeable to Sandoval also was not clearly erroneous. See, e.g., United States v. Ruiz, 905 F.2d 499, 508 (1st Cir. 1990) ("[W]here there is more than one plausible view of the circumstances, the sentencing court's choice among supportable alternatives cannot be clearly erroneous.").

Given our determination on this score, we need not address Sandoval's claims concerning the accessory-after-the-fact group. Sandoval argues that the group should have been limited to mere harboring, which receives fewer levels under the Guidelines. But, that difference would not have affected the TOL -- or the GSR -- that applied to Sandoval (not to mention the statutory maximum).[26]

---

[26] If the base offense level for the cross-reference had been 20 because the conduct was limited to "harboring," as Sandoval urges, that group would have been discounted for purposes of the combined offense level determination under U.S.S.G. § 3D1.4. See id. § 3D1.4(c) (providing that any group that is "9 or more levels less serious" will not increase the applicable offense level). The combined units would thus have added 2 levels rather than 3 levels. This would have resulted in a TOL of 43. But, the TOL was "treated as an offense level of 43," U.S.S.G. ch. 5, pt. A, cmt. n.2, even with the additional level resulting from the accessory-after-the-fact group.

Sandoval also asserts that a statutory-maximum sentence is such a significant upward variance from what he contends was his proper GSR -- 51 to 63 months -- that his sentence is substantively unreasonable. As we have explained, however, the District Court's calculation of the GSR as 240 months of imprisonment was not in error, and challenges based on substantive unreasonableness are "unlikely" to succeed when, as in this case, "the sentence imposed fits within the compass of a properly calculated [GSR]." United States v. Ruiz-Huertas, 792 F.3d 223, 228-29 (1st Cir. 2015) (quoting United States v. Vega-Salgado, 769 F.3d 100, 105 (1st Cir. 2014)). Given that the District Court offered a "plausible sentencing rationale" for the imposition of that statutory-maximum sentence and reached a "defensible result," United States v. Zapata-Vázquez, 778 F.3d 21, 24 (1st Cir. 2015) (quoting United States v. Martin, 520 F.3d 87, 96 (1st Cir. 2008)) -- namely, that murders and a great deal of violence occurred that would not have occurred but for this organization in which Sandoval was a "significantly high leader" -- the within-Guidelines sentence of 240 months of imprisonment that Sandoval received was substantively reasonable.

**B.**

Next, we take up the procedural and substantive reasonableness challenges that Guzman brings to his 192-month

sentence of imprisonment.  We first review the relevant procedural history.

**1.**

Guzman's PSR calculated an offense level based on four groups of relevant conduct:  accessory after the fact to the May 12, 2015 attempted murder; accessory after the fact to the September 20, 2015 murder; the attempted murder of December 27, 2015; and the attempted murder of January 1, 2016.  When combined with a "manager or supervisor" adjustment pursuant to U.S.S.G. § 3B1.1(b), these cross-references yielded a TOL of 37 and, with Guzman's CHC of I, a GSR of 210 to 240 months of imprisonment.[27] Guzman objected to all of these cross-references and to the "manager or supervisor" adjustment.

Guzman's sentencing hearing was held on November 15, 2018.  The District Court found that, by a preponderance of the evidence, Guzman was liable as an accessory after the fact to the May 12, 2015 attempted murder.  But, the District Court did not include as relevant conduct under U.S.S.G. § 2E1.1 the acts involving Joel Martinez -- the two attempted murders and being an accessory after the fact to the September 20, 2015 murder. Therefore, the District Court used a lower GSR than the PSR:  121

---

[27] The PSR calculated the GSR at 210 to 262 months of imprisonment, see U.S.S.G. ch. 5, pt. A (sentencing table), but reduced it to 210 to 240 months of imprisonment in light of the statutory maximum, see U.S.S.G. § 5G1.1.

to 151 months' imprisonment. But, the District Court stated that it found this range "too low" based on the facts and compared to other gang members' sentences. Thus, it stated that this was "a case that needs to be resolved on the factors of Section 3553(a)."

In conducting that analysis, the District Court started from the premise that the case involved "what's in effect a huge murder conspiracy," in which it found Guzman to have held a "substantial leadership role." But, the District Court also recognized that there was no evidence that Guzman personally committed violent acts and that there was less evidence against Guzman than against many of the other defendants charged in the indictment. The District Court also considered that Guzman had a close relationship with his family and a stable work history, that he had a painfully difficult childhood, and that he had joined the gang at a young age and there was "some evidence that he was participating less as time went on." The District Court ultimately imposed a 192-month sentence of imprisonment -- a sentence lower than Sandoval's (and lower than the government's recommendation as to Guzman, which was also the statutory-maximum 240 months) in light of Guzman's "somewhat diminished participation in the organization" and his "family ties."

## 2.

First, Guzman contends that accessory after the fact to attempted murder does not qualify as a RICO predicate act of

racketeering and thus that any conduct of that type could not be counted as relevant conduct in determining his offense level under the Guidelines. Our review is de novo. See United States v. Dávila-Félix, 667 F.3d 47, 54 (1st Cir. 2011).

As explained above, "underlying racketeering activity" under U.S.S.G. § 2E1.1 must be activity that qualifies as a RICO predicate act of racketeering under 18 U.S.C. § 1961(1). Carrozza, 4 F.3d at 77. Section 1961(1), in turn, defines "racketeering activity" to include "any act or threat involving murder . . . which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1)(A).

Guzman does not dispute that accessory after the fact to attempted murder is chargeable under state law and punishable by imprisonment for more than one year. See Mass. Gen. Laws ch. 274, § 4. But, he contends that accessory after the fact to attempted murder under Massachusetts law does not involve murder and so cannot qualify as a predicate act of racketeering.

In United States v. McKenney, 450 F.3d 39 (1st Cir. 2006), however, we construed the use of "involving" in a provision of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(2)(A)(ii) (providing that a "serious drug offense" includes "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance"), to mean "to relate closely"

- 89 -

or "to connect closely." Id. at 43. And, construing that same provision of the ACCA, the Supreme Court explained that "involve" can mean "to include as a necessary circumstance, condition, or consequence." See Shular v. United States, 140 S. Ct. 779, 786 (2020).

Relying on these definitions, the government argues that accessory after the fact to attempted murder under Massachusetts law -- because it requires that the offending conduct occur "after the commission of a felony" and with the knowledge that the principal "has committed a felony," Mass. Gen. Laws ch. 274, § 4 -- is an "act[] . . . involving murder," 18 U.S.C. § 1961(1)(A). On that basis, it urges that we affirm the District Court's treatment of this conduct as "underlying racketeering activity" used to set the base offense level under U.S.S.G. § 2E1.1.

By its terms, the Massachusetts accessory-after-the-fact statute does "include as a necessary circumstance," Shular, 140 S. Ct. at 785, the commission of the underlying felony, see Mass. Gen. Laws ch. 274, § 4. Guzman nonetheless contends that the accessory-after-the-fact offense in question is not one "involving murder." But, at least given the limited arguments that he makes to us for reaching that conclusion, we cannot agree.

Guzman first contends that the constructions of "involving" in McKenney and Shular "contain no limiting principle." But, we are hardly in a position as a panel to rely

on that rationale here, for to do so would be to undermine both a prior precedent of our court and a precedent of the Supreme Court. Moreover, contrary to Guzman's assertion, we emphasized in McKenney that "involving" "is not to be too broadly read" and that the "relationship must not be too remote or tangential." 450 F.3d at 45. And, Guzman does not develop an argument that insofar as there is a limiting principle, this case is on the wrong side of it.

To the extent that he does develop such an argument, it is based solely on his contention that accessory after the fact to attempted murder has a different mens rea from the offense of murder itself and involves conduct "that is often, in itself, comparatively innocuous." And, in support of his position on this score, Guzman relies on one out-of-circuit precedent construing a provision that is quite distinct textually from the one at issue here. That precedent is the Ninth Circuit's decision in United States v. Innie, 7 F.3d 840 (9th Cir. 1993), which rejected the government's argument that being an accessory after the fact to a "crime of violence" under the then-existing career offender provision of the Guidelines is analogous to conspiring to commit or aiding and abetting a "crime of violence" under that provision of the Guidelines. See id. at 852.

But, the question in that case, given what the relevant provision of the Guidelines said, was not the same as ours or the

one presented in McKenney.  It concerned whether the defendant's prior conviction for murder for hire "involve[d] conduct that presents a serious potential risk of physical injury to another." Id. at 849 (quoting U.S.S.G. § 4B1.2(1) (1991)).

True, in that distinct context, the Ninth Circuit found it significant that, "unlike one who conspires to commit a crime of violence, an accessory after the fact does not agree to commit the crime of violence" and thus that the accessory-after-the-fact offense did not constitute a "crime of violence" under that Guidelines provision.  Id. at 852.  But, we do not see how that addresses the issue here.

One can see the basis for the conclusion -- contestable as it may be -- that an offense of accessory after the fact to murder for hire may not "involve[] conduct that presents a serious risk of physical injury to another," U.S.S.G. § 4B1.2(1) (1991), given the temporal relationship between the "risk" that must be generated by the offense and when the offense of accessory after the fact to murder for hire actually occurs.  But, here, we are not attempting to determine whether the offense of accessory after the fact to attempted murder involves conduct that poses a risk of physical injury.  We are trying to determine only whether it may be said to be one "involving murder," 18 U.S.C. § 1961(1)(A).

Thus, Guzman has not shown that McKenney and Shular, which construed a provision using similar "involving" language, do

not support the government's position that this accessory-after-the-fact offense qualifies as one involving murder because murder is a "necessary circumstance" or "condition" of the offense, Shular, 140 S. Ct. at 785. Given the limited and inapposite arguments that Guzman makes to us in challenging this aspect of the District Court's sentencing of him, we reject his challenge to it, without thereby suggesting that there is no basis for questioning whether such an offense can be a racketeering act based on it being deemed one "involving murder."[28]

**3.**

Having rejected Guzman's legal contention that the conduct involved in the offense of accessory after the fact to attempted murder cannot constitute "underlying racketeering

---

[28] We do note that the U.S. Department of Justice's own RICO manual for federal prosecutors, which neither the government nor Guzman refers to, states that "as a general rule, [a] state offense[] for 'accessory after the fact' to the commission of a state offense referenced in Section 1961(1)(A) does not constitute 'an act involving' such a referenced offense" and cites Innie as seeming support for that conclusion. Organized Crime & Gang Section, U.S. Dep't of Justice, Criminal RICO: 18 U.S.C. § 1961-1968: A Manual for Federal Prosecutors 27 n.22, 406 & n.445 (6th ed. 2016), https://www.justice.gov/archives/usam/file/870856/download. We note as well that, in relying on Shular, the government does not address the fact that, in addressing the meaning of "involving" in 18 U.S.C. § 924(e)(2)(A)(ii), the Supreme Court specifically distinguished Scheidler v. National Organization for Women, Inc., 537 U.S. 393 (2003), which was construing the same RICO provision we consider here. See Shular, 140 S. Ct. at 786; Scheidler, 573 U.S. at 409. Guzman, however, does not cite Scheidler or develop any argument sounding in § 1961(1)(A)'s generic-offense approach. Therefore, he has waived any argument to that effect. See Zannino, 895 F.2d at 17.

activity" here because the offense is not an act of racketeering under RICO, we must consider Guzman's factual argument concerning the accessory-after-the-fact cross-reference. But, here, too, we are not persuaded.

**a.**

Again, the District Court applied only one accessory-after-the-fact cross-reference as to Guzman. This was related to the May 12, 2015 stabbing. The evidence presented about that stabbing came primarily from Hernandez Miguel's testimony.

According to that testimony, Hernandez Miguel went with other MS-13 members to a park in Chelsea on a request from a fellow ESLS member who had encountered members of the rival 18th Street gang there. On the way to the park, Hernandez Miguel testified, they picked up a foot-long military-style knife. Hernandez Miguel testified that, once they arrived at the park, the "chavalas" started running after an MS-13 member flashed a knife. Hernandez Miguel saw two ESLS members beating a rival gang member on the ground -- he then joined them and started stabbing the rival gang member with the military-style knife. The man he was stabbing kicked the knife while Hernandez Miguel was stabbing him with it, and Hernandez Miguel ended up cutting himself.

Hernandez Miguel left with CW-1 and another individual who was associated with a different MS-13 clique. He testified that they decided to go to Guzman's house given that Hernandez

Miguel was bleeding a lot.  Guzman led Hernandez Miguel into the basement, where Hernandez Miguel "told [Guzman] what had happened."  According to Hernandez Miguel's testimony, Guzman helped Hernandez Miguel clean the wound by pouring tequila on it, provided Hernandez Miguel with clean clothing, and told Hernandez Miguel that he would dispose of the bloody clothing by "tak[ing] it to the garbage since he worked with the garbage" (which may have been a reference to Guzman's employment as a garbage collector).  Guzman also, according to this testimony, expressed concern that the individual who was not an ESLS member "might snitch" and told Hernandez Miguel that he should not have brought along someone Guzman did not know.

The government's evidence also included testimony from an officer with the Chelsea Police Department who, the evidence supportably shows, responded to the scene of the stabbing.  The officer testified that an individual with tattoos he associated with the 18th Street gang was lying on the ground bleeding from a single stab wound to the left side of the middle of his torso. The individual was transported "immediately to the hospital" in an ambulance.

**b.**

Guzman first argues that the evidence was insufficient to show by a preponderance of the evidence that the underlying act -- the May 12, 2015 stabbing -- constituted attempted murder under

Massachusetts law. The District Court supportably concluded that Hernandez Miguel did intend to commit murder, given that he stabbed someone in the torso and given the context in which that stabbing had occurred, based on what the evidence supportably showed about the mission of the ESLS clique and the reason they were attacking rival gang members in the park. This conclusion was not clear error.

Guzman next argues that, even if the stabbing did constitute attempted murder, the government still failed to show that Guzman had sufficient knowledge of the underlying felony to be considered an accessory after the fact under Massachusetts law. Even assuming, as Guzman contends, that this requires that Guzman was apprised of "the substantial facts of the [underlying] felonious crime," Commonwealth v. Devlin, 314 N.E.2d 897, 899 & n.4 (Mass. 1974), we find that the District Court did not clearly err in answering this question in the affirmative. In addition to Hernandez Miguel's testimony that he told Guzman "what had happened" and what the evidence supportably showed about Guzman's understanding of the clique's mission, the District Court could supportably conclude from Hernandez Miguel's description of Guzman's actions -- which included explaining that he would throw Hernandez Miguel's clothes away because he "worked with the garbage" and expressing concern that someone might "snitch" --

that a preponderance of the evidence showed that Guzman "knew that [the] felony had been committed," Devlin, 314 N.E.2d at 899.

## 4.

Next, Guzman asserts that the District Court imposed an upward departure without notice. This challenge is based on the fact that, in the statement of reasons, the District Court completed the section corresponding to departures (section V) rather than the section corresponding to variances (section VI), indicating an above-Guidelines departure under U.S.S.G. § 5K2.18 pursuant to a government motion for departure. Our review is for abuse of discretion. See United States v. Flores-Quiñones, 985 F.3d 128, 133 (1st Cir. 2021).

## a.

As Guzman acknowledges, the government had not sought an upward departure. And, as he also acknowledges, the District Court did not check the box in section IV of the statement of reasons indicating that it departed from the Guidelines range (IV.C); instead, it checked the box indicating that it imposed a variance (IV.D).

The District Court explained, moreover, that it was imposing a sentence based on the 18 U.S.C. § 3553(a) factors. Thus, in the context of the record as a whole, we find it clear that the District Court was varying rather than departing, despite its completion of the "departures" section of the written statement

of reasons.  See United States v. Santini-Santiago, 846 F.3d 487, 491 (1st Cir. 2017) (explaining that setting a sentence in reference to the § 3553(a) factors is the "hallmark of a variance").

**b.**

Guzman argues in the alternative that even if the District Court is deemed to have fashioned a variant sentence under § 3553(a), there was still procedural error.  Our review is for abuse of discretion.  See Flores-Machicote, 706 F.3d at 20.

First, Guzman contends that Fed. R. Crim. P. 32(h)'s notice requirement "applies equally to both departures and variances," but we have squarely rejected this claim.  See United States v. Aponte-Vellón, 754 F.3d 89, 93-94 (1st Cir. 2014) (citing Irizarry v. United States, 553 U.S. 708, 716 (2008)).  He also argues that even if the District Court is deemed to have fashioned a variant sentence in light of the sentencing factors enumerated in § 3553(a), its reliance on U.S.S.G. § 5K2.18 -- violent gang membership -- would still have contravened Guidelines principles. Cf. United States v. Lawrence, 254 F. Supp. 3d 441, 455 (E.D.N.Y. 2017) (Weinstein, J.) ("The Guidelines do not consider gang membership as a factor in sentencing, except for defendants who are sentenced under 18 U.S.C. § 521 . . . .").

Guzman does not point to any indication other than the check mark in the statement of reasons that the District Court

used this particular rationale, and the District Court did not refer to U.S.S.G. § 5K2.18 at the sentencing hearing. Instead, its § 3553(a) analysis shows that the District Court considered what it found to be Guzman's "significant role" in what was "in effect a huge murder conspiracy." And, aside from his sufficiency arguments, Guzman does not argue that this was problematic as a Guidelines matter.

**5.**

Next, Guzman assigns error to the District Court's finding that Guzman was a "manager or supervisor" under U.S.S.G. § 3B1.1(b), which resulted in a three-level enhancement. Guzman asserts that his title as "second word" was not alone sufficient to conclude that he functioned as a manager or supervisor. And, he contends, the evidence of the role he actually played in the clique did not support the District Court's finding that he played a managerial or supervisory role. He contends that he did not "exercise significant decisionmaking authority."[29] Instead, Guzman argues, his role was effectively like that of any other homeboy,

---

[29] This language comes from the factors listed in application note 4 to U.S.S.G. § 3B1.1. Guzman contends that the District Court "fail[ed] to properly apply the multi-factor analysis set forth in" U.S.S.G. § 3B1.1 and that application note. But, application note 4 sets out factors, including "the exercise of decision making authority," for sentencing courts to use in "distinguishing a leadership and organizational role" -- which receives an additional offense-level increase -- "from one of mere management or supervision."

save perhaps for his role collecting dues, which was, he argues, a role more akin to a "mere clerk" than a "discretionary decisionmaker" entrusted to handle substantial funds. Our review is for clear error, see United States v. Soto-Beníquez, 356 F.3d 1, 54 (1st Cir. 2003), and we find none.

At trial, Hernandez Miguel testified that Guzman was in charge of the clique money and would "collect the dues." The government also argues that Guzman had some degree of control over the clique's guns. And, while testimony at trial indicated that clique members considered Sandoval the "main runner" and Guzman as the "second one," Hernandez Miguel also testified that "the second one is there in case the first one is not." The evidence also supportably showed that clique members sought permission from the "runners," plural, which was fairly understood to include Guzman, to do certain things and that clique members reported their activities to "runners," plural.

In light of this evidence, we find that the District Court did not clearly err in finding, by a preponderance of the evidence, that Guzman exercised "some 'degree of control or organizational authority over others.'" United States v. Cali, 87 F.3d 571, 578 (1st Cir. 1996) (quoting United States v. Fuller, 897 F.2d 1217, 1220 (1st Cir. 1990)); see also United States v. Savoie, 985 F.2d 612, 616 (1st Cir. 1993) ("Managerial status [generally] attach[es] if there is evidence that a defendant, in

committing the crime, exercised control over, or was otherwise responsible for overseeing the activities of, at least one other person.").

**6.**

Finally, Guzman contends that his above-Guidelines sentence was substantively unreasonable. As we have indicated, "[t]he hallmarks of a substantively reasonable sentence are 'a plausible sentencing rationale and a defensible result.'" Zapata-Vázquez, 778 F.3d at 24 (quoting Martin, 520 F.3d at 96). When, as here, we are reviewing a sentence outside the GSR, we are "obliged to consider the extent of the variance," but we still "give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." Martin, 520 F.3d at 92 (quoting Gall v. United States, 552 U.S. 38, 51 (2007)). "[E]ven a substantial variance does not translate, ipso facto, into a finding that the sentence is substantively unreasonable." Flores-Machicote, 706 F.3d at 25. Instead, "[w]e will reverse only where the sentence is either outside the 'universe of reasonable sentences' or was implausibly reasoned." United States v. Alejandro-Rosado, 878 F.3d 435, 440 (1st Cir. 2017) (quoting United States v. Rivera-González, 776 F.3d 45, 52 (1st Cir. 2015)). We review for abuse of discretion. See Martin, 520 F.3d at 87.

Guzman's substantive reasonableness challenge is based in part on the District Court's reliance on what he contends were improper sentencing factors. First, Guzman contends that the District Court's statements that Guzman "did not accept responsibility" and "did not cooperate" improperly punished Guzman for exercising his Fifth and Sixth Amendment rights. The record does not indicate that the District Court increased Guzman's sentence for this reason. Instead, the record makes clear that, in determining what Guzman's sentence should be, the District Court was considering how Guzman's offense conduct and sentencing considerations compared to other defendants charged in the FSI, such that Guzman's sentence would fairly compare to those other sentences imposed. And, one consideration relevant to that inquiry was the fact that some of those defendants' sentences reflected the fact that they had received credit for their cooperation or acceptance of responsibility "within the meaning of the guidelines." Moreover, to the extent the District Court was considering the fact that Guzman did not personally cooperate or accept responsibility in setting his sentence, we have held that considerations such as failure to accept responsibility can properly inform a sentencing court's § 3553(a) analysis even when the Guidelines range itself reflects the fact that the defendant did not accept responsibility. See United States v. Paz Uribe,

891 F.2d 396, 400 (1st Cir. 1989); United States v. Cruzado-Laureano, 527 F.3d 231, 236-37 (1st Cir. 2008).

Guzman also contends that the District Court's upward-variance decision was based largely on factors already accounted for in the Guidelines calculation -- specifically, Guzman's leadership role and his role as an accessory after the fact to the May 12, 2015 attempted murder.

To the extent the District Court relied on these factors to impose a sentence above the Guidelines range, it "specifically articulate[d] [its] reasons for doing so," which was all it was required to do. United States v. Maisonet-González, 785 F.3d 757, 764 (1st Cir. 2013); see also United States v. Hernández-Ramos, 906 F.3d 213, 215 (1st Cir. 2018) (concluding that the sentencing court's reliance on offense conduct and personal characteristics in varying upward was not improper double-counting because those considerations "form the foundation of most guidelines calculations" and therefore the defendant's "double-counting argument, if embraced, would render every variance based on offense conduct and the defendant's characteristics unreasonable"). The District Court did not abuse its discretion in this respect.

Guzman also argues that to the extent the above-Guidelines sentence was based on his gang membership, this, too, was improper. Because this argument relies on the U.S.S.G. § 5K2.18 argument we have already rejected, it fails here as well.

Guzman also asserts that an above-Guidelines sentence could not rest on Guzman's participation in the gang or his participation in Joel Martinez's jump-in given the evidence showing that his "participation waned considerably during the government's investigation of the case" and that he "was not supportive of expanding ESLS to include [Joel Martinez] and his associates."  But, the District Court did account for Guzman's "somewhat diminished participation" in the organization and the evidence suggesting "that he was participating less and maybe caring more about his family than the gang."  Its determination that the fact that "he held a leadership role in an organization that encouraged people to commit murder, that promoted murder and that protected murderers" nevertheless justified an upwardly variant sentence was plausible.

We conclude that the District Court's sentencing rationale, which carefully addressed the competing considerations -- such as Guzman's family ties, hard work, and "somewhat diminished participation" in the organization along with his leadership role in "what's in effect a huge murder conspiracy" -- both was plausible and arrived at a result that was within the "universe of reasonable sentences," Rivera-González, 776 F.3d at 52.  There was no error in this regard.

## C.

We next consider the challenges that Larios brings to his 180-month sentence of imprisonment for RICO conspiracy. We begin by explaining the relevant procedural history.

## 1.

The PSR calculated five groups to determine Larios's adjusted offense level, based on the following relevant conduct: the cocaine conspiracy related to the drug protection detail, calculated based on 5 kilograms of cocaine; the conspiracy to murder CW-1; accessory after the fact to the September 20, 2015 murder of Irvin de Paz; accessory after the fact to the December 27, 2015 attempted murder; and accessory after the fact to the January 1, 2016 attempted murder.

Larios objected to all of these cross-references. He also objected to the use of the preponderance standard for the relevant conduct determination, arguing that such enhancements should be proved beyond a reasonable doubt. And, he argued that he was entitled to a downward departure for sentencing factor manipulation.

At Larios's sentencing on November 19, 2018, the District Court reiterated its finding, as a general matter, that accessory after the fact does constitute racketeering activity for purposes of U.S.S.G. § 2E1.1(a)(2). But, the District Court declined to adopt the PSR's attribution of the three accessorial

crimes to Larios. And, the District Court calculated the drug conspiracy group based on one kilogram of cocaine -- an amount it found foreseeable to Larios -- rather than the five kilograms used in the PSR. The District Court adopted the PSR's recommendation as to the cross-reference for conspiracy to murder CW-1, which it found appropriate to include as a Guidelines matter. Thus, the District Court determined that Larios had a TOL of 35. Combined with a CHC of I, this generated a GSR of 168 to 210 months of imprisonment. See U.S.S.G. ch. 5, pt. A (sentencing table).

The District Court imposed a 180-month prison sentence. In doing so, it stated that it felt the sentence imposed would be "appropriate whether or not the guidelines came out the way they did, whether higher or lower." In determining that the sentence was appropriate, the District Court considered, among other factors, that Larios was not a clique leader, that there was no evidence that he had personally committed actual violence, and the sentences given to his codefendants.

### 2.

Larios challenges the standard of proof used to find relevant conduct based on the Due Process Clause of the U.S. Constitution. He contends that it requires that a heightened standard of proof apply to those determinations when the relevant conduct drives the Guidelines significantly higher. He relies for this proposition on our recognition that "[a]t the outer limits,

Guidelines offense-level increases based on uncharged crimes might violate a defendant's Sixth Amendment and due process rights if the additional increases are responsible for such a disproportionate share of the sentence that they become the 'tail which wags the dog of the substantive offense.'" United States v. González, 857 F.3d 46, 59-60 (1st Cir. 2017) (quoting United States v. Lombard, 72 F.3d 170, 176 (1st Cir. 1995)). Our review is de novo. See id. at 58.

We have recognized that "[r]elevant conduct increases a defendant's sentence, sometimes very significantly, despite the fact that it was not charged in an indictment, and even despite the fact that a jury may have acquitted the defendant for that precise conduct." Carrozza, 4 F.3d at 80 (citation omitted). Nevertheless, we have held that the applicability of relevant conduct need only be proved by a preponderance of the evidence where it does not change the statutory sentencing range, see id.; González, 857 F.3d at 58-61, and we have rejected the suggestion that there may be reason to deviate from this rule in the RICO context, see Carrozza, 4 F.3d at 80-81.

Nor did the use of the preponderance standard to determine relevant conduct in this particular case lead to an outcome so unfair as to raise due process concerns. This Court has found an enhancement based on relevant conduct to raise such concerns in one case, which we described as "an unusual and perhaps

a singular case." Lombard, 72 F.3d at 187; see also González, 857 F.3d at 60. Larios makes no attempt to compare his case to the "extreme" circumstances present there. And, any comparison demonstrates that Larios's argument cannot succeed.

Larios received a sentence under the 20-year statutory maximum for the offense of conviction. See 18 U.S.C. § 1963(a); Lombard, 72 F.3d at 180-81; see also González, 857 F.3d at 60 (finding it "critical[]" that the sentence imposed was the statutory maximum for the pled-to crime, unlike in Lombard, in which there was no statutory maximum for the pled-to crime and the relevant conduct thus "essentially displaced the lower Guidelines range that otherwise would have applied," 72 F.3d at 178); United States v. Caba, 241 F.3d 98, 101 (1st Cir. 2001). Moreover, the District Court here "recognized its discretion to sentence [Larios] outside of the Guidelines range," González, 857 F.3d at 60, and in fact noted that although the sentence imposed did fall within the calculated Guidelines range, that sentence was selected as the appropriate one under 18 U.S.C. § 3553(a) based on factors including comparison to Larios's codefendants, see id. (noting that one confounding factor in Lombard had been the sentencing court's belief that it "lacked the authority to impose anything less than a life sentence").

# 3.

Larios separately contends that there is insufficient evidence in the record, even under a preponderance standard, to attribute the drug conspiracy and the conspiracy to murder CW-1 to him. We disagree.

We address the cross-reference for conspiracy to murder CW-1 first. This cross-reference reflects the testimony from Hernandez Miguel that Larios had told him that he had previously "made a plan" with Martinez to kill CW-1 and had asked Sandoval for a "green light."

Larios argues that Hernandez Miguel's testimony about Larios's statements was uncorroborated; that the statements, if made, were merely "idle chatter"; and that even if Larios did make the statements and was sincere, there was no agreement and "can be no conspiracy based on only one person's illusory desire." But, we will set the District Court's determination on this score aside only if clearly erroneous. See Sepulveda, 15 F.3d at 1200.

Having presided over the lengthy and complex trial, the District Court was "steeped in the facts of the case" and in a superior position to make credibility determinations. Id. It thus did not clearly err in attributing the conspiracy to murder CW-1 to Larios for sentencing purposes based on Hernandez Miguel's testimony indicating that Larios and Martinez had "devised a plan" and the fact that such testimony comported with the other evidence

adduced at trial about MS-13's methods of operation, which included killing informants but only upon a "green light" from leadership.

Given this conclusion, we need not consider Larios's arguments that the inclusion of the drug conspiracy as "underlying racketeering activity" was unsupportable. The inclusion of that offense as a cross-reference had no independent effect on the TOL -- or the GSR -- that applied to Larios.[30] See Sepulveda, 15 F.3d at 1199 ("It is unnecessary to address an allegedly erroneous sentencing computation if, and to the extent that, correcting it will not change the applicable offense level or otherwise influence the defendant's GSR . . . ."); cf. Carrozza, 4 F.3d at 82 n.10 (noting that district courts need not even "make findings as to acts proffered as relevant conduct" if those acts will not affect the offense level under U.S.S.G. § 3D1.4).[31]

---

[30] Because the drug quantity that the District Court used for the drug conspiracy cross-reference resulted in an adjusted offense level for that group that was nine levels lower than the adjusted offense level for the "conspiracy to murder CW-1" group, it did not result in an offense-level increase. See U.S.S.G. § 3D1.4(c) (providing that groups "9 or more levels less serious than the Group with the highest offense level . . . will not increase the applicable offense level but may provide a reason for sentencing at the higher end of the sentencing range for the applicable offense level"). Thus, Larios would have faced a TOL of 35, and a GSR of 168 to 210 months of imprisonment, with or without the determination that the events surrounding the drug protection detail constituted "underlying racketeering activity" under U.S.S.G. § 2E1.1.

[31] Larios also briefly assigns error to the District Court's reliance on the accessorial crimes stemming from the January 8, 2016 clique meeting and jump-in of Joel Martinez. As he acknowledges, however, the District Court did not include any

**4.**

Larios's final challenge regarding his sentence takes aim at the District Court's decision rejecting his claim of sentencing factor manipulation, which is also known in this circuit as "sentencing entrapment." United States v. DePierre, 599 F.3d 25, 29 (1st Cir. 2010). Larios bears the burden to show by a preponderance of the evidence that "the government . . . improperly enlarged the scope or scale of the crime to secure a higher sentence." See id.; see also United States v. Barbour, 393 F.3d 82, 86 (1st Cir. 2004). Our review is for clear error. Barbour, 393 F.3d at 86.

We note at the outset that, to the extent Larios can be understood as arguing that the District Court failed to even consider his sentencing manipulation claim, we disagree. The District Court made clear that it overruled any argument Larios made based on sentencing entrapment or manipulation. See United States v. Jaca-Nazario, 521 F.3d 50, 57 (1st Cir. 2008) (concluding based on a similar statement that the sentencing court considered sentencing factor manipulation enough to reject it). In fact, as Larios's counsel acknowledged during the sentencing hearing, the

─────────────

accessory-after-the-fact cross-references as "underlying racketeering activity" under U.S.S.G. § 2E1.1. Thus, his argument that those offenses were not charged or chargeable RICO predicates is inapposite. Larios develops no argument suggesting that the District Court's consideration of this activity in conducting a § 3553(a) analysis was otherwise improper.

District Court had already considered and rejected the need to consider sentencing manipulation during Sandoval's sentencing proceeding.

Nor can we conclude that the District Court clearly erred in making the determination that sentencing manipulation had not been shown. The primary focus of the sentencing manipulation inquiry in this circuit is on the impropriety of the government's conduct. DePierre, 599 F.3d at 29; Jaca-Nazario, 521 F.3d at 58. In order to meet his burden, Larios must show "extraordinary misconduct." DePierre, 599 F.3d at 29 (quoting Jaca-Nazario, 521 F.3d at 58); accord United States v. Montoya, 62 F.3d 1, 4 (1st Cir. 1995).

Larios relies on the government's role in the drug protection detail and the circumstances linking Larios to the December 27, 2015 and January 1, 2016 attempted murders and the Irvin de Paz murder. But, none of these events inflated the applicable GSR. Thus, we do not see how sentencing manipulation would apply here, much less have an effect in Larios's case, given that it provides an "equitable remed[y]" in the form of lowering the offense level or authorizing a below-Guidelines sentence in those cases in which the sentence has been improperly driven up by government misconduct. United States v. Capelton, 350 F.3d 231, 246 (1st Cir. 2003); see also Montoya, 62 F.3d at 3; United States v. Gibbens, 25 F.3d 28, 31 (1st Cir. 1994).

Moreover, while Larios does attempt to differentiate CW-1's involvement from an ordinary sting operation in terms of CW-1's personal involvement in serious, unauthorized criminal activity, there was a factual dispute as to the government's knowledge of these unauthorized acts, and the government's explanation, "apparently credited by the district court, is at least as plausible as the adverse inference that [Larios] would have us draw," Gibbens, 25 F.3d at 32. So, too, were there plausible explanations for the government to delay the arrest of Joel Martinez. See Barbour, 393 F.3d at 85-86 (explaining that legitimate reasons to delay the arrest of the defendant himself included identifying additional coconspirators and obtaining more evidence).

A defendant "cannot make out a case of undue provocation simply by showing that the idea originated with the government or that the conduct was encouraged by it, or that the crime was prolonged beyond the first criminal act, or exceeded in degree or kind what the defendant had done before." Montoya, 62 F.3d at 3-4 (citations omitted). Moreover, "the district court's ultimate judgment whether the government's conduct is outrageous or intolerable is not lightly to be disregarded." Id. at 4. Accordingly, we conclude that there is no merit to Larios's claim of sentencing factor manipulation.

**D.**

Finally, we consider Martinez's sentencing challenges. Martinez, who was acquitted of the RICO conspiracy count, was convicted only of conspiracy to distribute (500 grams or more of) cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846.

After receiving the PSR, Martinez objected to the inclusion of material related to conduct for which he was acquitted in the PSR's statement of offense conduct. He argued that the material, which was not conduct related to the drug offense for sentencing purposes, was "extremely prejudicial and harmful." Martinez requested a statutory-minimum sentence of 60 months. The government requested a sentence of double that length, arguing that Martinez was "more dangerous than his GSR suggests" given corroborated evidence of Martinez's involvement in MS-13 and his commission of violence on behalf of the enterprise.

Martinez was sentenced on December 18, 2018. The District Court adopted the PSR's GSR calculation of 60 to 63 months of imprisonment.[32] At Martinez's sentencing hearing, the District Court noted that "considerable caution" was warranted with respect to the use of acquitted conduct. Nevertheless, it concluded that it "could find fairly easily by a preponderance of the evidence

---

[32] Martinez's TOL of 24 and CHC of I yielded an advisory GSR of 51 to 63 months, see U.S.S.G. ch. 5, pt. A (sentencing table), but the GSR was compressed by the interposition of a statutory mandatory minimum, see U.S.S.G. § 5G1.1(c)(2).

that Mr. Martinez was a member of MS-13, that he attended ESLS clique meetings," and that he was present at Joel Martinez's jump-in. The District Court imposed an upwardly variant sentence of 72 months -- significantly lower than the government's recommendation of 120 months -- to "reflect[] the fact that . . . Martinez is more dangerous an individual than the guidelines or his criminal record suggest."

Martinez appeals his 72-month sentence as procedurally unreasonable on two grounds. First and foremost, he challenges the District Court's reliance on acquitted conduct in sentencing. Additionally, he argues -- albeit only in a footnote -- that the District Court improperly departed from the GSR without meeting the requirements of U.S.S.G. § 5K2.18 or Fed. R. Crim. P. 32(h).

**1.**

We take the acquitted conduct point first. Martinez acknowledges that this argument is foreclosed by First Circuit precedent. See, e.g., United States v. Gobbi, 471 F.3d 302, 314 (1st Cir. 2006) (holding that United States v. Booker, 543 U.S. 220 (2005), did not change the law that "acquitted conduct, if proved by a preponderance of the evidence, still may form the basis for a sentencing enhancement"). But, Martinez argues at length that this Court, in so holding, has adopted an erroneous and overbroad interpretation of United States v. Watts, 519 U.S. 148, 156-57 (1997) (per curiam) (holding that "a jury's verdict of

acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence"). He therefore effectively asks us to reconsider this Court's decisions upholding the use of acquitted conduct at sentencing.

Martinez makes no argument as to how we may do so, however. With rare exceptions, "newly constituted panels in a multi-panel circuit are bound by prior panel decisions closely on point." United States v. Rodríguez, 527 F.3d 221, 224-25 (1st Cir. 2008). Martinez makes no attempt to establish how either of those exceptions -- which require either that subsequently announced controlling authority contradict the preexisting panel opinion or that subsequently announced authority, "although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind," id. at 225 (quoting Williams v. Ashland Eng'g Co., 45 F.3d 588, 592 (1st Cir. 1995)) -- apply here.

And, indeed, it is clear they do not. Martinez argues that Booker, along with various Justices' calls (in non-controlling opinions) to examine the continuing use of acquitted conduct in sentencing, see, e.g., Jones v. United States, 574 U.S. 948, 948 (2014) (Scalia, J., dissenting from denial of certiorari), demonstrates that "the Supreme Court has never foreclosed challenges to the use of acquitted conduct at sentencing under the

Due Process Clause and the Sixth Amendment's right to a trial by jury."  This invocation of that precedent, however, fails to provide a basis for this panel to revisit this Court's (post-Booker) opinions expressly foreclosing that very issue.  Nor do the post-Watts cases Martinez cites as emphasizing "the central role of the jury" suffice to meet the "narrowly circumscribed" exceptions to the law-of-the-circuit doctrine, United States v. Barbosa, 896 F.3d 60, 74 (1st Cir. 2018).

**2.**

Martinez also contends, like Guzman, that the District Court applied an improper upward departure.  Again, we review for abuse of discretion.  See Flores-Quiñones, 985 F.3d at 133.

Here, too, the District Court checked the box for U.S.S.G. § 5K2.18 -- "Violent Street Gang" -- in the "reasons for departure" section of the statement of reasons.  But, unlike in Guzman's statement of reasons, the District Court in Martinez's case also completed section VI of the statement of reasons, which concerns variances.  Doing so was consistent with its selection under section IV of the statement of reasons that it was "impos[ing] a sentence otherwise outside the sentencing guideline system (i.e., a variance)" and not departing from the Guidelines range.

Moreover, the District Court's oral pronouncements make clear that it was varying rather than departing.  The District

Court did state that it was going to "depart upward but only to 72 months," but it is clear in context that the District Court was not referring to a formal departure under the Guidelines. And, in its oral statement of reasons, the District Court explained that the sentence was "a nonguideline sentence imposed under Section 3553(a) for the reasons indicated." We find that the record indicates that the District Court imposed a variant sentence rather than a departure. See United States v. Nelson, 793 F.3d 202, 206-07 (1st Cir. 2015) (finding variance rather than departure even though "[t]he district court at one point used the term 'depart'" but then "explained its decision to impose an above-the-range sentence" in part by referencing "several of the enumerated section 3553(a) factors").

In any event, any procedural error that occurred to the extent that the District Court's rationale is better understood as a departure would be harmless. The record makes abundantly clear that "the district court would have imposed the same sentence as a variance in any event," Aponte-Vellón, 754 F.3d at 93, and Martinez makes no separate claim that the extent of the variance was unwarranted.

## IX.

For the foregoing reasons, we **affirm** the convictions and sentences for these defendants.